1  Barbara Enloe Hadsell, Esq. [S.B. #086021]
   Dan Stormer, Esq. [S.B. #101967]
2  Joshua Piovia-Scott, Esq. [S.B. #222364]
   Mohammad Tajsar, Esq. [S.B. #280152]
3  HADSELL STORMER & RENICK LLP
   128 N. Fair Oaks Avenue
4  Pasadena, California 91103
   Telephone: (626) 585-9600
5  Facsimile: (626) 577-7079
   Emails: bhadsell@hadsellstormer.com
6          dstormer@hadsellstormer.com
           jps@hadsellstormer.com
7          mtajsar@hadsellstormer.com

8  Lori Rifkin, Esq. [S.B. # 244081]
   RIFKIN LAW OFFICE
9  P.O. Box 19169
   Oakland, California 94619
10 Telephone: (415) 685-3591
   Email: lrifkin@rifkinlawoffice.com

11 Attorneys for Plaintiffs

12                 **UNITED STATES DISTRICT COURT**
13                 **EASTERN DISTRICT OF CALIFORNIA**

14  JAMES JOSHUA MAYFIELD,          Case No.: CV-02499-JAM-AC
    JAMES ALLISON MAYFIELD, JR.     [Assigned to the Honorable John A.
15  and TERRI MAYFIELD,             Mendez – Courtroom 6]

16              Plaintiffs,         **SECOND AMENDED COMPLAINT**
                                    **FOR DAMAGES; DEMAND FOR**
17  vs.                             **JURY TRIAL**

18  IVAN OROZCO, in his individual  1. Excessive Force (Fourth Amendment)
    capacity, SHERIFF SCOTT JONES, in 2. Unreasonable Search and Seizure
19  his individual and official capacity,    (Fourth Amendment)
    JAMES LEWIS, in his individual and 3. Failure to Provide Medical Care
20  official capacity, RICK PATTISON, in    (Fourteenth Amendment)
    his individual and official capacity, 4. Failure to Protect from Harm
21  COUNTY OF SACRAMENTO,              (Fourteenth Amendment)
    REGENTS OF THE UNIVERSITY OF   5. Deprivation of Substantive Due
22  CALIFORNIA and DR. GREGORY         Process (First and Fourteenth
    SOKOLOV, in his individual and     Amendments)
23  official capacity, and Does 1-5,  6. Medical Malpractice
                                    7. Failure to Furnish Medical Care
24              Defendants.         8. Assault
                                    9. Battery
25                                  10. Civil Code §52.1
                                    11. Negligence
26                                  12. Negligent Supervision, Training,
                                        Hiring, and Retention
27                                  13. Dangerous Condition on Public
                                        Property
28                                  14. Intentional Infliction of Emotional
                                        Distress
                                    15. Negligent Infliction of Emotional
                                        Distress

SECOND AMENDED COMPLAINT

1

## INTRODUCTION

2      1.      On July 17, 2013, 20-year-old James Mayfield, a pre-trial detainee at

3 the Sacramento County Jail, attempted to commit suicide by diving head first from

4 his bunk bed to the floor of his cell. Although he did not die, he suffered a

5 significant spinal injury that left him paralyzed and cognitively impaired for the rest

6 of his life. Defendants were aware that Mr. Mayfield had been diagnosed with

7 serious mental illness. Defendants had also identified Mr. Mayfield as a suicide

8 risk, knew that he had repeatedly attempted to commit suicide while in Jail, and

9 were aware that he had specifically threatened to jump off his bunk to do so.

10 Defendants also knew that Mr. Mayfield had repeatedly been subjected to physical

11 attacks at the Jail, including an assault by Jail correctional officers and sexual

12 assaults by other inmates. Despite this knowledge, Defendants failed to provide Mr.

13 Mayfield with appropriate mental health care, failed to take adequate steps to

14 protect him from harm, including self-harm, and, in fact, affirmatively placed Mr.

15 Mayfield in danger by placing him in a cell with known suicide hazards.

16      2.      Defendant Ivan Orozco, a one of the Jail's correctional officers,

17 brutally assaulted Mr. Mayfield on November 22, 2012, repeatedly kicking and

18 kneeing him in the head while he lay on the ground. After the assault, Mr.

19 Mayfield's already tenuous mental health deteriorated even faster. He smeared his

20 own feces all over his face and body and was found with a plastic deodorant

21 container lodged in his rectum. He reported that he had been repeatedly raped by

22 other inmates. Defendants remained deliberately indifferent to Mr. Mayfield's

23 mental health needs and potential for suicide despite his worsening condition,

24 including affirmatively preventing his admission to the Jail's psychiatric unit, and

25 their conduct culminated in his suicide attempt and subsequent paralysis.

26      3.      Mr. Mayfield was released from Jail soon after his suicide attempt and

27 injury. He now lives with his parents, whose relationship with their son has not only

28 been significantly impacted by his permanent psychological and physical

SECOND AMENDED COMPLAINT          -1-

impairments, but who are required by California law to provide him with the 24 hour-a-day care that he will need for the rest of his life.

## JURISDICTION

4.      This Complaint seeks damages for violations of the civil rights, privileges, and immunities guaranteed by the First, Fourth and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, and for violations of California state law.

5.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, because the claims form part of the same case or controversy arising under the United States Constitution and federal law.

## VENUE

7.      Plaintiffs' claims arose in the County of Sacramento, California. Venue therefore lies in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

## PARTIES

8.      Plaintiff James Joshua Mayfield is a 22-year-old citizen of the United States who was incarcerated at the Sacramento County Jail in Sacramento, California, at the time of the incidents described herein.  Mr. Mayfield currently resides in San Joaquin County, California with his parents.

9.       Plaintiff James Allison Mayfield, Jr. is the father of James Joshua Mayfield. He is suing individually for violations of civil rights under the First and Fourteenth Amendments.

10.     Plaintiff Terri Lynn Mayfield is the stepmother of James Joshua Mayfield. She is suing individually for violations of civil rights under the First and Fourteenth Amendment.

11.     Defendant County of Sacramento is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of Sacramento operates and manages the Sacramento County Jail and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the Sacramento County Sheriff's Department and the Sacramento County Jail, and each entity's respective employees and/or agents. The Sacramento County Sheriff's Department operates the Sacramento County Jail, and is and was responsible for ensuring the provision of emergency and medical and mental health care services to all Sacramento County Jail inmates.

12.     Defendant Ivan Orozco is, and was at all relevant times mentioned herein, an officer in the Sacramento County Sheriff's Office. While on shift at the Jail, he was and is responsible for the safety and security of inmates and ensuring that their constitutional rights are protected. On November 22, 2012, Defendant Orozco assaulted Mr. Mayfield and violated his constitutional rights. Defendant Orozco is being sued in his individual capacity.

13.     Defendant Scott Jones is, and was at all relevant times mentioned herein, the Sheriff of the County of Sacramento, the highest position in the Sacramento County Sheriff's Department. As Sheriff, Defendant Jones is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all Sacramento County Sheriff's Department custodial employees and/or agents. Defendant Jones is and was charged by law with the administration of the Sacramento County Jail, and is responsible for safety and security of inmates housed at the Jail.  Defendant Jones also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sacramento County Sheriff's Department alleged herein were committed. Defendant Jones is being sued in his individual and official capacities.

1   14.   Defendant James Lewis is, and was at all times relevant herein, the

2   Sacramento County Chief of Corrections. Defendant Lewis is being sued in his

3   individual and official capacities.

4   15.   Defendant Rick Pattison is, and was at all times relevant herein, the

5   Sacramento County Commander of the Main Jail Division. Defendant Pattison is

6   being sued in his individual and official capacities.

7   16.   Defendant Regents of the University of California contracts with the

8   Sacramento County Sheriff's Department to provide psychiatric treatment in the

9   Sacramento County Jail.

10   17.   Defendant Dr. Gregory Sokolov, M.D. is a Health Sciences Clinical

11   Professor at the University of California at Davis Department of Psychiatry and

12   Behavioral Sciences and is the Medical Director of the Sacramento County's Jail

13   Psychiatric Services unit. Defendant Sokolov is being sued in his individual and

14   official capacities.

15   18.   Defendants Does 1-5 are custody and/or medical staff at Sacramento

16   County Jail who were responsible for the safety and security of Mr. Mayfield

17   and/or providing him with adequate health treatment. Defendants Does 1-5

18   supervised and/or participated in the events complained of herein. At the present

19   time, the identities of Does 1-5 are unknown and not discoverable to Plaintiffs.

20   Plaintiffs will substitute the true names of Does 1-5 when Plaintiffs are able to

21   ascertain their identities through discovery. Does 1-5 are sued in their individual

22   capacities.

23   19.   Plaintiffs are informed and believe and thereon allege that at all times

24   mentioned in this Complaint, Defendants, and each of them, were the agents,

25   employees, servants, joint venturers, partners and/or co-conspirators of the other

26   Defendants named in this Complaint and that at all times, each of the Defendants

27   was acting within the course and scope of said relationship with Defendants.

28   / / /

SECOND AMENDED COMPLAINT        -4-

# FACUAL ALLEGATIONS

20. James Allison Mayfield, Jr. is the father of James Joshua Mayfield. He has held a California State license as painter for 32 years, ran a successful painting contracting business, and held a leadership position in his church for 15 years before being forced to abandon his business and church activities to care for his son. Terri Lynn Mayfield is James Joshua Mayfield's step-mother. She has served as the Choir Director in the family's church since 2007 and previously assisted James Allison Mayfield, Jr. with his painting business before the family was forced to close it down. James Joshua Mayfield lived with his father, step-mother and siblings in the suburbs of San Jose and was a diligent and successful student and athlete before being tragically injured in a high school football game.

## I. Mayfield Suffers a Significant Head Injury During a High School Football Game and Begins to Have Mental Health Issues

21. On November 3, 2007, the month before he turned 15 years old, Mr. Mayfield suffered a significant head injury during a high school football game. He initially experienced a cerebral concussion and then minutes later suffered a series of at least five grand mal seizures. He was taken to the emergency room, where medical staff was unable to stabilize him and was forced to induce a coma. He eventually brought out of the coma but was never the same again.

22. Mr. Mayfield's injury occurred during the last game of his freshman year at Mount Pleasant High School in San Jose, California. Mr. Mayfield was named the freshman player of the year and chosen for the all-league team. The year before, he had been selected as the MVP of his school's basketball team and the player of the year in the basketball league. In addition to his athletic success, Mr. Mayfield had been a diligent student and was carrying a 3.4 grade point average at the time of the head injury.

23. Not only was Mr. Mayfield unable to participate in organized sports after his head injury but his grades started to go down and he began having

behavioral issues that he had never had before. By the end of his freshman year, his grade point average had plummeted to 2.3. He was depressed, angry and aggressive in ways he had never been before. His attention, concentration and memory were significantly impaired, and he expressed suicidal thoughts for the first time. Although he had never previously had issues with the law or his school, he was suspended from school and arrested for the first time in the Spring of 2008.

24.    A psychologist who examined Mr. Mayfield in April 2008 after his first arrest concluded that Mr. Mayfield had "severe" cognitive difficulties that were caused by the head injury he suffered in November 2007. At the urging of the psychologist, Mr. Mayfield's parents removed him from school and hired a private teacher to home school him. They also enrolled Mr. Mayfield in anger management therapy, participated in weekly family therapy sessions and worked closely with Mr. Mayfield's educators to ensure he was receiving the appropriate instruction.

25.    Mr. Mayfield's condition continued to worsen despite his family's efforts and support. Mr. Mayfield was diagnosed as paranoid schizophrenic and began taking low doses of psychotropic medication.

26.    Medical records for Mr. Mayfield indicate that he attempted to commit suicide on at least four separate occasions and was placed on an involuntary psychiatric hold pursuant to California Welfare and Institutions Code section 5150 just prior to his incarceration in the Sacramento County Jail. Mr. Mayfield's parents provided Defendants with these medical records before the November 2012 assault and the July 2013 suicide attempt.

**II.    Defendants Are Repeatedly Put on Notice that Mr. Mayfield is Suicidal but Fail to Adequately Address This and His Other Mental Health Needs**

27.    Mr. Mayfield was arrested and incarcerated in the Sacramento County Jail on or about June 5, 2011. Mr. Mayfield's parents, particularly his father, visited him almost every week, provided Defendants with information and records regarding Mr. Mayfield's psychiatric history and condition and worked closely with

his criminal defense attorneys in an attempt to make sure that Mr. Mayfield was receiving appropriate treatment while in the Jail.

28.    Defendants were deliberately indifferent to Mr. Mayfield's serious mental health needs despite repeated notice that he was suicidal and had significant mental health issues, as detailed in the following paragraphs.

29.    A July 7, 2011 psychiatric evaluation conducted at the request of the Sacramento Superior Court summarized Mr. Mayfield's psychiatric history, including his diagnosis of paranoid schizophrenia and history of at least four suicide attempts, and concluded that he had a "moderate to high risk of violence toward himself and others in both the short and long term." The evaluating doctor further concluded that Mr. Mayfield was not competent to stand trial on the criminal charges that had been brought against him, that he had no capacity to make decisions about his medications or treatment, and confirmed the previous diagnoses of paranoid schizophrenia.

30.    In an August 6, 2011 report for the Superior Court, another mental health professional who examined Mr. Mayfield recounted his history of self-harm and documented that he "was responding to internal stimuli" and appeared to be hallucinating during their interview. The psychologist confirmed that Mr. Mayfield was schizophrenic and concluded that his psychiatric condition was worsening.

31.    On or about August 13, 2011, Mr. Mayfield attempted to run away from one of the deputies when the deputy was escorting him back to his cell. Defendants claimed that they needed to use pepper spray in order to control Mr. Mayfield and that he told them that "I am hearing voices and the voices told me to take your keys and run so that I could escape." Defendants' records also indicate that Mr. Mayfield informed them that he felt suicidal.

32.    On August 15, 2011, Defendants identified Mr. Mayfield as a danger to himself and "gravely disabled." He was sent to the Jail's inpatient psychiatric unit and then discharged back to the general population on August 18. Defendants'

1  records indicate that Mr. Mayfield did not receive any mental health treatment

2  between August 18 and September 3, 2011.

3       33.     On September 3, 2011, Mr. Mayfield again informed Defendants that

4  he was "having suicidal thoughts" and "wanted to hurt himself." Defendants

5  responded by handcuffing him and placing him in a classroom.

6       34.     On information and belief, Defendants' primary practice for

7  addressing potentially suicidal inmates is to handcuff them in a classroom until they

8  can be assessed by qualified psychiatric staff. This classroom is inadequately

9  equipped to house suicidal inmates and, among other things, does not contain

10 running water, a bed or a toilet. Due to understaffing, mentally ill inmates,

11 including Mr. Mayfield, are repeatedly subjected to this process and regularly spend

12 long periods of time restrained in the classroom waiting for psychiatric treatment

13 after expressing suicidal ideations. On information and belief, suicidal inmates are

14 regularly restrained in the classroom for as long as two days, a strategy Defendants

15 refer to as "classroom therapy," whereby Defendants seek to pressure the inmates to

16 deny they are suicidal so that they can be denied admission to the psychiatric unit

17 and returned to the general population without treatment.

18      35.     Although Sacramento County's correctional facilities had an average

19 daily population of 4,046 inmates in 2012, there are only 18 beds in the system's

20 one inpatient Psychiatric Services Unit. The Sacramento County Sheriff's

21 Department's 2013 report titled "A Proactive Response to Public Safety

22 Realignment" confirms these numbers and adds that "Due to the limited capacity

23 [of the Inpatient Psychiatric Services Unit], there is often a waiting list for

24 admission to this Unit."

25      36.     Despite the fact that he continued to inform Defendants that he was

26 suicidal, Mr. Mayfield was denied psychiatric care on September 3, 2011 and

27 returned to the general population.  There is no indication in Defendants' records

28 that Mr. Mayfield received any additional treatment or was evaluated by a Doctor

SECOND AMENDED COMPLAINT          -8-

1  in connection with his September 3, 2011 report that he was suicidal.

2      37.    On or about September 29, 2011, Mr. Mayfield was admitted to the

3  California Department of Mental Health Hospital in Napa in order to restore his

4  competency to stand trial. After receiving treatment and medication at the hospital

5  for approximately two months, Mr. Mayfield was found to be competent to stand

6  trial on November 22, 2011 and returned to the Sacramento County Jail soon

7  thereafter. The doctors in Napa diagnosed Mr. Mayfield as paranoid schizophrenic

8  and documented his hallucinations and paranoid delusions. Other than the therapy

9  and other non-medication treatment he received during the two months he spent at

10  the Napa Hospital, Defendants' treatment of Mr. Mayfield was almost exclusively

11  limited to administering medications.

12      38.    Defendants' records indicate that Mr. Mayfield did not receive any

13  additional mental health treatment when he was returned to Sacramento County Jail

14  at the end of 2011. Without treatment, his mental health once again decompensated,

15  and on March 22, 2012, Mr. Mayfield again informed Defendants that he was

16  suicidal and then urinated on an electrical outlet and started a fire.

17      39.    On March 23, 2012, Mr. Mayfield was admitted to the Jail's inpatient

18  psychiatric facility on the basis that he was a danger to himself. Mr. Mayfield was

19  housed in the psychiatric unit from March 23, 2012 to April 24, 2012. Jail deputies

20  admit to striking Mr. Mayfield 3-4 times in the head and face on March 25, while

21  he was housed in the psychiatric unit, claiming that Mr. Mayfield lunged at them.

22  There is no record indicating that he was examined for injury as a result of this

23  attack or that he received any additional treatment.

24      40.    On May 9, 2012, approximately two weeks after Mr. Mayfield had

25  been released from the psychiatric unit, Jail staff reported that Mr. Mayfield

26  informed them that he was "hearing voices telling him to jump/bang his head/kill

27  himself." He told psychiatric unit personnel that voices were "telling him to jump

28  off the upper tier . . . [and that] he cannot resist these voices." Mr. Mayfield was

SECOND AMENDED COMPLAINT         -9-

again identified as a danger to himself and "gravely disabled" and was placed in a safety suit and handcuffed in a Jail classroom. He informed Jail personnel that he had attempted suicide on 27 previous occasions.

41.    Mr. Mayfield was admitted to the psychiatric unit on May 10, 2012. On May 11, 2012, a psychiatrist from the UC Davis Department of Psychiatry submitted a psychiatric evaluation of Mr. Mayfield at the request of the Superior Court. This evaluation states that Mr. Mayfield reported that he had suicidal ideations and concluded that he had a history of suicidal ideation and was a "moderate suicide risk." The psychiatrist diagnosed Mr. Mayfield as schizophrenic with hallucinations and paranoid delusions.

42.    On May 14, 2012, Defendants observed Mr. Mayfield repeatedly tearing his own foreskin and pounding the door in his cell. On May 15, Mr. Mayfield again informed Jail personnel that voices had been telling him to jump off the tier and kill himself. In a psychiatric progress note on the same date, the evaluating doctor noted that Mr. Mayfield had engaged in self-injurious behavior the day before, that his "acute suicide risk is high" and that his actions "suggest a need for further observation."

43.    Despite the psychiatrist's May 15, 2012 assessment that Mr. Mayfield was at acute risk for harm and required further observation, Defendants discharged Mr. Mayfield from the inpatient unit the very next day. On the May 16, 2012 form authorizing Mr. Mayfield's discharge from the psychiatric unit, Defendants further noted that Mr. Mayfield reported that he had a "plan to jump off top tier or bang his head" and that he had been hearing voices for the last three weeks telling him to kill himself by jumping off the top tier. Despite this, Mr. Mayfield did not receive any additional treatment and was returned to general population.

44.    Defendants' records indicate that on October 12, 2012, Mr. Mayfield pressed his emergency cell button and informed Defendants that he was suicidal, hearing voices and that he planned on choking himself to death. However,

Defendants did not transfer him to the psychiatric unit or place him on the waiting list for the unit.

45.    On October 13, 2012, Mr. Mayfield informed Jail personnel that he had attempted suicide while housed in the psychiatric unit in May 2012 and stated that he "had plans to jump off his bunk or another high place [to commit suicide] if given the chance."  Defendants placed Mr. Mayfield on the waiting list for the psychiatric unit.

46.    On October 14, Mr. Mayfield continued to report that he was hearing voices and had suicidal urges and Defendants concluded that he remained a danger to himself.

47.    On October 15, 2012, Jail Psychiatric Services noted that Mr. Mayfield had attempted suicide at least three times previously and that the last attempt had been made within the last year. Despite this knowledge, Defendants discharged Mr. Mayfield from the psychiatric unit and returned him to general population that day.

**III.    Defendants Assault Mayfield**

48.    Defendant Ivan Orozco, a deputy in the Sacramento County Jail, assaulted Mr. Mayfield on or about November 22, 2012.

49.    According to Defendants' records of the incident, Mr. Mayfield went to retrieve the snack he was assigned as treatment for his diabetes at around 9:45 p.m. However, Mr. Mayfield was unable to open the door to enter the area where he was to receive the snack and he threw his hands up and began mumbling to himself in frustration. After Defendant Orozco opened the door for Mr. Mayfield, Defendant Orozco pushed him to the ground. When Mr. Mayfield got up, Defendant Orozco threw him back to the ground. Defendant Orozco admits that he then kicked Mr. Mayfield in the face "several times" while Mr. Mayfield was on the ground. Defendant Orozco further admits that after repeatedly kicking Mr. Mayfield in the face, he then "kneed [Mr. Mayfield] in the head and shoulder area approximately four times." Defendants' records indicate that the assault was

captured on at least two of the video cameras located in the Jail.

50.     As a result of this incident Mayfield suffered physical injuries including, but not limited to, numerous scrapes, severe bruising, and a laceration on his lip which required seven stitches to close. Despite these injuries, Mr. Mayfield was not hospitalized and was merely given Tylenol for the pain.

51.     Defendants failed to assess the impact of this incident on Mr. Mayfield's mental health or provide him with any additional evaluation or treatment. Defendants failed to take any additional actions even though this incident included repeated strikes to Mr. Mayfield's head and Defendants were aware that his mental illness had been originally caused by a traumatic head injury.

52.     None of the deputies involved in the assault, including Defendant Orozco, required medical attention for the alleged injuries they suffered during this incident.

53.     Mr. Mayfield was charged with battery against a police officer in violation of Penal Code 243(C)(2) in connection with this incident. On information and belief, these charges were later dropped at the preliminary hearing after the prosecutor reviewed the videos of the incident and made statements to the effect that, based on the conduct of the deputies who assaulted Mr. Mayfield, she could not move forward with the criminal charges against him.

54.     On information and belief, Defendants subjected Mr. Mayfield to additional retaliatory actions after this incident and the district attorney's refusal to bring criminal charges. Although his family had visited Mr. Mayfield regularly after his incarceration in Sacramento, he was not allowed to have visitors for approximately six weeks after the assault.

55.     The November 2012 assault and subsequent retaliation was a breaking point for Mr. Mayfield. He lost all trust in Defendants and any hope that his mental health would improve while in custody.

/ / /

**IV.  Mayfield's Mental Health Continues to Deteriorate and Defendants Fail to Take Appropriate Suicide Precautions**

56.     On January 22, 2013, two months after Defendants' brutal assault on Mr. Mayfield, Jail personnel reported finding Mr. Mayfield "completely covered in feces from head to toe. Mayfield had feces smeared around his face, including his mouth and there were small chunks of feces in his hair. . . I asked him what was wrong and he told me he was suicidal." When he was taken to wash the feces off his body, Jail staff found a plastic deodorant stick lodged in his rectum.

57.     Defendants' records reflect that when Mr. Mayfield was asked why he had covered himself in his own feces, he stated that he was trying to make himself sick and that he had been "beat up bad." Mr. Mayfield further informed Jail personnel that he was "sick of living" and reported that other inmates were stealing his thoughts when he slept.

58.     After Mr. Mayfield was admitted to the psychiatric unit on or about January 22, 2013, he was found sobbing in his cell and informed Jail personnel that he had been "raped daily" by two other inmates. Defendants noted that Mr. Mayfield was "very distraught."

59.     Defendants failed to provide Mr. Mayfield with any therapeutic treatment or counseling to address the sexual assaults he reported and the obvious effects of these assaults on Mr. Mayfield's mental state. There is no indication in the records provided by the Jail that Mr. Mayfield ever received any treatment in connection with these issues, nor that Defendants investigated Mr. Mayfield's complaints of sexual assault.

60.     Although Defendants' records reflect that Mr. Mayfield continued to express suicidal thoughts, Defendants removed him from suicide precautions on January 29, 2013.

61.     Defendants then discharged him from the psychiatric unit and returned him to the general population on February 2, 2013. On information and belief, Mr.

SECOND AMENDED COMPLAINT                    -13-

Mayfield did not receive any additional treatment as a result of this disturbing incident.

62.     Less than one month after being returned to the general population, Jail personnel again reported that Mr. Mayfield was expressing suicidal ideation. On February 24, 2013, Mr. Mayfield informed Jail personnel that "he was suicidal . . . . [and that] he tried to kill himself by sticking his head inside the toilet." During a psychiatric assessment later that day, Mr. Mayfield informed a nurse that "I was contemplating putting my face in the toilet" in an attempt to take his own life. Mr. Mayfield also informed staff that "I put my face in a plastic bag 6 days ago" in another attempt to commit suicide. Despite these statements and Mr. Mayfield's recent history of suicide attempts at the Jail, including within the past week, the evaluating nurse indicated that Mr. Mayfield did not express suicidal ideation.

63.     In an April 24, 2013 psychiatric evaluation for Mr. Mayfield's criminal case, a forensic psychiatrist again concluded that Mr. Mayfield was not competent to stand trial on the criminal charges that had been brought against him. The evaluation stated that Mr. Mayfield had an "established history of violence including suicidality" and an active, psychotic mental disorder. The examiner further concluded that Mr. Mayfield was not malingering.

64.     Defendants' records indicate that on June 20, 2013, Jail personnel observed him tearing and braiding his blanket. He was admitted to the psychiatric unit based on suicide risk, but once again transferred back to general population on June 25, less than a month before the suicide attempt that would result in his paralysis.

65.     Defendants failed to take basic precautions with inmates who were suicidal and repeatedly failed to provide mentally ill inmates with adequate health care throughout Mr. Mayfield's time in the Sacramento County Jail. On information and belief, this included failing to provide any treatment other than medication, allowing individuals who were not licensed or trained to administer

SECOND AMENDED COMPLAINT          -14-

1  medications to administer medications, improperly administering medications,

2  reducing the type of medications that were available, failing to adequately monitor

3  suicidal inmates, failing to use safety suits and other safety precautions, using

4  safety suits and other safety precautions as punishment, providing generic treatment

5  plans that were not tailored to the individual patient's needs, over diagnosing

6  patients as malingering, and providing insufficient follow-up for patients that had

7  been admitted to the psychiatric unit. Many of these failures involved violations of,

8  or changes to, existing policies that had been put in place to require adequate

9  treatment. This inadequate treatment and insufficient follow-up resulted in repeated

10  cycling of patients, including Mr. Mayfield, into and out of the psychiatric unit.

11  Defendants' failures also resulted in repeated suicide attempts and/or suicides,

12  including by patients that had been accused of malingering.

13      66.    On one occasion, a mentally ill inmate was physically restrained for

14  almost 24 hours without food, water, treatment or medication while staff waited for

15  a response from a doctor who was in Las Vegas and not returning calls.

16      67.    On information and belief, there have been at least 14 suicides, and

17  numerous other attempted suicides, in the Sacramento County Jail in the last 12

18  years.

19      68.    On information and belief, starting in or about June of 2013

20  Defendants placed a social worker with no medical training in the position of

21  Program Director for the psychiatric unit at the Sacramento County Jail. Although

22  this position had previously been assigned to a registered nurse who had

23  purportedly been trained to care for patients and administer medications, the new

24  Program Director did not have even this level of training or licensure. Despite the

25  fact that she was not licensed to do so, the new Program Director began

26  administering medications to the inmates, resulting in repeated medication errors.

27  Nurses and other Jail personnel complained about this but nothing was done.

28  / / /

SECOND AMENDED COMPLAINT        -15-

1

2

**V.     Mayfield is Placed on a "Do Not Admit" to the Psychiatric Unit List,**

**Attempts Suicide and Becomes Paralyzed**

3       69.     On information and belief, Defendant Gregory Sokolov, the Medical

4  Director for the County's Jail Psychiatric Services who is responsible for

5  supervising the doctors in the psychiatric unit, placed Mr. Mayfield on a list of

6  inmates who were not to be admitted to the psychiatric unit without Dr. Sokolov's

7  express approval. While other inmates who were not on this list could be admitted

8  to the psychiatric unit by any number of other staff members, Dr. Sokolov required

9  his personal approval for the evaluation or admission of Mr. Mayfield because he

10  found Mr. Mayfield difficult and characterized him as "malingering." On

11  information and belief, Dr. Sokolov's list, which was maintained on a Microsoft

12  Word document that was regularly printed out and taped to the wall in the facility,

13  was not governed by any policy or rule other than Dr. Sokolov's personal whims.

14       70.     As a result of being placed on Dr. Sokolov's "do not admit" list, Mr.

15  Mayfield was housed in general population rather than the psychiatric unit in July

16  2013.

17       71.     Mr. Mayfield was allegedly part of what Defendants call an

18  "outpatient program" in general population.  Inmates in the outpatient program in

19  general population are supposed to be checked regularly and send requests for

20  medical attention, known as "kites," to Jail staff if they are in distress.

21       72.     On information and belief, Mr. Mayfield repeatedly sent "kites" to Jail

22  personnel during the weeks and days leading up to his July 17, 2013 suicide attempt

23  in which he stated that he was suicidal and asked for psychological treatment. Jail

24  personnel received these messages from Mr. Mayfield and indicated that they were

25  urgent but Defendants did not respond. Mr. Mayfield's cries for help were ignored.

26       73.     Despite having specific notice that Mr. Mayfield was considering

27  killing himself by jumping head-first onto the floor from a bunk or tier, and despite

28  knowledge of Mr. Mayfield's extensive history of suicide attempts and subjection

SECOND AMENDED COMPLAINT          -16-

1   to trauma and assault at the Jail, Defendants housed him in a general population cell

2   with a bunk bed and hard floors. Defendants kept Mr. Mayfield in this cell in July

3   2013 in spite of the kites he sent expressing suicidal ideation and requesting mental

4   health care.

5         74.    On or about July 17, 2013, Mr. Mayfield apparently dove or otherwise

6   propelled himself from his bunk bed onto the floor and sustained damage to his

7   body and nervous system.

8         75.    Defendants' records indicate that at 2:04 a.m. on July 17, a Jail deputy

9   observed that Mr. Mayfield was lying on the ground in his cell. The records do not

10   indicate that the deputy made any attempt to communicate with Mr. Mayfield at

11   that time or investigate the situation further.

12         76.    One hour later, at 3:05 a.m., this same deputy was conducting a routine

13   cell check when he noticed that Mr. Mayfield had not moved from the ground. Mr.

14   Mayfield informed the deputy that "I jumped off the top of my bunk head first. I

15   was trying to commit suicide. I was sick of dealing with the courts and being in jail.

16   I can't move my arms of leg and my neck hurts."

17         77.    Mr. Mayfield was transferred to the hospital at the UC Davis, where it

18   was determined that he had sustained a spinal injury, including, but not limited to, a

19   C5 burst fracture with retropulsion leading to tetraparesis with paraplegia and

20   sensory deficits.

21         78.    Defendants did not inform Mr. Mayfield's parents of his suicide

22   attempt or injuries. His parents did not learn of this event until approximately one

23   week later when a nurse from the UC Davis hospital informed them that their son

24   had been injured and was being treated there. Mr. Mayfield's father and step-

25   mother took turns spending time with him in the hospital and made sure that one of

26   them was there with him at all times.

27         79.    After Mr. Mayfield's parents learned of Mr. Mayfield's injuries and

28   had the opportunity to review the treatment he was receiving, including

medications, they raised concerns with the medical staff at UC Davis regarding the high dosages and types of psychotropic medications that he was being given. On or around August 21, 2013, Mr. Mayfield's parents met with the medical staff at UC Davis, who informed them that UC Davis had continued the same dosages and medications that Mr. Mayfield was prescribed at Sacramento County Jail. The UC Davis medical staff informed Mr. Mayfield's parents that these medications and/or dosages were, in fact, inappropriate, and that they would be adjusted. On information and belief, this inappropriate administration of psychotropic medications by Defendants to Mr. Mayfield is known to cause serious side effects, including suicidal thoughts and ideation.

80.     Mr. Mayfield's injuries mean that he is bed-ridden and unable to feed, clean, care for himself, or perform other activities of daily living. He now requires constant intensive care.

81.     Following Mr. Mayfield's injuries, Defendants dropped most of the charges against him, allowed him to plead no contest to one count of felony robbery, gave him credit for the more than two years he had spent at the Sacramento County Jail and released him to the custody of his father and step-mother with the express understanding that they would assume all of the responsibility for his medical care.

82.     Mr. Mayfield's father closed his painting business, resigned the leadership position he had held for more than 15 years at his church and dedicated himself full-time to his son's care. The family had to purchase medical equipment that would allow Mr. Mayfield to live at their home, including a hospital bed, oxygen dispenser and a wheelchair. Before his discharge from the hospital, Mr. Mayfield's father and step-mother trained with nurses there for 2-4 hours a day for 8 weeks, learning, among other things, how to perform Mr. Mayfield's bowel care, attach and remove his catheter, prevent bed sores and infections, and administer his numerous medication injections. Mr. Mayfield's father is now his full-time

caregiver and essentially devotes 24 hours a day to his son's medical needs. After repeatedly checking on Mr. Mayfield and adjusting his medication during the night, Mr. Mayfield's father's day begins at 8 a.m. when he checks and administers Mr. Mayfield's medication, prepares and feeds him his breakfast, changes his diaper and catheter, stretches, massages and exercises Mr. Mayfield and prepares him for his day. This regimen takes place every day and lasts from morning until late into the evening.

83.     Mr. Mayfield entered the Sacramento County Jail at 18 years old, fully capable of most physical activities. He could walk, run, jump, skip and dance. When Defendants discharged Mr. Mayfield from their custody two and a half years later, he was paralyzed from his neck down and unable to even feed himself or walk.

84.     The lack of appropriate mental health treatment provided at the Jail combined with the physical and psychological abuse to which Defendants subjected him severely exacerbated Mr. Mayfield's mental illness, and led to the repeated decompensation of his mental health, and, ultimately, to the suicide attempt that left him paralyzed and further traumatized.

85.     As a result of Defendants' actions and omissions, Mr. Mayfield has experienced and will continue to experience extreme pain and suffering and loss of enjoyment of life.  As a further result of Defendants' conduct, Mr. Mayfield has and will continue to incur millions of dollars in expenses for lost wages, medical care, and assistance with daily living.

86.     Mr. Mayfield's injuries and the constant care he now requires have been devastating for his parents and required them to put their lives aside and spend basically all of their time, energy and limited financial resources caring for him. As a result of Defendants' actions and inactions, Mr. Mayfield's parents have also experienced and will continue to experience pain, suffering, and financial hardship. / / /

SECOND AMENDED COMPLAINT          -19-

1

**EXHUASTION OF PRE-LAWSUIT PROCEDURES**

2

**FOR STATE LAW CLAIMS**

3

87.     Plaintiff filed timely governmental tort claims with Defendant County

4

of Sacramento regarding the November 22, 2012 assault on May 22, 2013 and

5

regarding the July 17, 2013 suicide attempt on January 16, 2014. By

6

correspondence dated May 29, 2013 and February 5, 2014, respectively, the County

7

of Sacramento rejected these governmental tort claims.

8

**CAUSES OF ACTION**

9

**First Cause of Action**

10

**Excessive Force in Violation of the Fourth Amendment of United States**

11

**Constitution (42 U.S.C. §1983)**

12

**(Plaintiff James Joshua Mayfield against Defendants Orozco, Jones, Does 1-5,**

13

**and County of Sacramento)**

14

88.     Plaintiffs incorporate all of the above previous paragraphs as if fully

15

set forth herein.

16

89.     The acts of Defendants relating to the November 2012 incident

17

deprived Mr. Mayfield of his rights under the Fourth Amendment of the United

18

States Constitution by utilizing excessive force upon him.

19

90.     The force used by Defendant Orozco against Mr. Mayfield was

20

unjustified and excessive.

21

91.     All of the acts of Defendants and the persons involved were done

22

under color and pretense of the statutes, ordinances, regulations, customs, official

23

policies, official procedures, and usages of the County of Sacramento.

24

92.     Various deputies, directly or indirectly, participated in the affirmative

25

acts of others, with the result that Mr. Mayfield was injured.

26

93.     On information and belief, Mr. Mayfield alleges that the County of

27

Sacramento has an inadequate policy of supervising sheriff's deputies and has not

28

adequately trained its deputies so as to prevent the use of unlawful force such as

SECOND AMENDED COMPLAINT          -20-

1   that described above.

2        94.    As a direct and proximate result of Defendants' actions, Mr. Mayfield

3   suffered humiliation, embarrassment, discomfort, mental anguish, fear, anxiety, loss

4   of reputation, emotional distress, and loss of his liberty and freedom.

5        95.    Defendants' actions were malicious, oppressive and/or in reckless

6   disregard of the Plaintiff's rights, thereby justifying an award to Plaintiff of

7   exemplary or punitive damages to punish the wrongful conduct alleged herein and

8   to deter such conduct in the future.

9                                    **Second Cause of Action**

10   **Unreasonable Search and Seizure in Violation of the Fourth Amendment of**

11                    **United States Constitution (42 U.S.C. §1983)**

12   **(Plaintiff James Joshua Mayfield against Defendants Orozco, Jones, Does 1-5,**

13                           **and County of Sacramento)**

14        96.    Plaintiffs incorporate all of the above previous paragraphs as if fully

15   set forth herein.

16        97.    The acts of Defendants relating to the November 2012 incident

17   deprived Mr. Mayfield of his rights under the Fourth Amendment of the United

18   States Constitution by effectuating an unreasonable search and/or seizure of him.

19        98.    Defendant Orozco's actions against Mr. Mayfield were unreasonable,

20   and effectuated a search and/or seizure of Mr. Mayfield's person in violation of the

21   Fourth Amendment.

22        99.    All of the acts of Defendants and the persons involved were done

23   under color and pretense of the statutes, ordinances, regulations, customs, official

24   policies, official procedures, and usages of the County of Sacramento.

25        100.   Various deputies, directly or indirectly, participated in the affirmative

26   acts of others, with the result that Mayfield was injured.

27        101.   On information and belief, Mr. Mayfield alleges that the County of

28   Sacramento has an inadequate policy of supervising sheriff's deputies and has not

1   adequately trained its deputies so as to prevent the use of unlawful force such as

2   that described above.

3        102.   As a direct and proximate result of Defendants' actions, Mr. Mayfield

4   suffered humiliation, embarrassment, discomfort, mental anguish, fear, anxiety, loss

5   of reputation, emotional distress, and loss of his liberty and freedom.

6        103.   Defendants' actions were malicious, oppressive and/or in reckless

7   disregard of the Plaintiff's rights, thereby justifying an award to Plaintiff of

8   exemplary or punitive damages to punish the wrongful conduct alleged herein and

9   to deter such conduct in the future.

10                        **Third Cause of Action**

11   **Deliberate Indifference to Serious Medical and Mental Health Needs in**

12   **Violation of the Fourteenth Amendment of United States Constitution (42**

13                        **U.S.C. §1983)**

14   **(Plaintiff James Joshua Mayfield against Defendants Jones, Lewis, Pattison,**

15   **County of Sacramento, Dr. Gregory Sokolov, Does 1-5, and Regents of the**

16                        **University of California)**

17        104.   Plaintiffs incorporate all of the above previous paragraphs as if fully

18   set forth herein.

19        105.   The County of Sacramento and the University of California at Davis'

20   policies, practices, and procedure deprived Mr. Mayfield of his rights under the

21   Fourteenth Amendment of the Constitution, including, without limitation, the right

22   to adequate medical and mental health care. This conduct represents a policy and/or

23   practice of deliberate indifference towards the needs of inmates.

24        106.   On numerous occasions prior to July 17, 2013, Defendants were

25   informed and knew that Mr. Mayfield routinely held suicidal ideations, was

26   routinely gravely disabled, and was routinely an immediate danger to himself.

27   However, Defendants failed to administer standard and necessary medical and

28   mental health treatment to Mr. Mayfield before, during, and after these episodes.

SECOND AMENDED COMPLAINT          -22-

1    Defendants also failed to properly classify and house Mr. Mayfield based on his

2    serious health needs.

3         107.   The policies, procedures, and protocols which Defendants had in place

4    and which were administered by personnel at the Jail related to mental health

5    treatment and suicide prevention were legally and medically insufficient to protect

6    Mr. Mayfield from suicide and harm. For instance,

7         a.    After having specifically noted in the chart that Mr. Mayfield was

8              considering killing himself by jumping head-first onto the floor,

9              Defendants forced Mr. Mayfield to live in a room with a bunk bed and

10             hard floors in which he suffered injury. Defendants should have taken

11             steps to mitigate or eliminate these dangers. These and other physical

12             characteristics of the room constituted unreasonably dangerous

13             premises.

14        b.    Mr. Mayfield reported his suicidal ideations to Jail personnel on many

15             occasions. However, Defendants' only response was to isolate Mr.

16             Mayfield in restraints in a classroom or the psychiatric unit, without

17             providing necessary clinical treatment, and then release him back to

18             the general population without any additional treatment and little, if

19             any, follow-up.

20        c.    Defendants failed to have proper protocols, policies, and procedures in

21             place to minimize and mitigate Mr. Mayfield 's ability to inflict self-

22             harm.

23        d.    Defendants' procedures, practices, policies, and processes for

24             assessing and treating inmates with serious mental illness, including

25             Mr. Mayfield, focused on acute symptoms of a very limited number of

26             inmates and did not adequately identify or treat inmates with serious

27             mental health needs. Inmates with serious mental health conditions,

28             such as Mr. Mayfield, were unable to obtain timely and appropriate

SECOND AMENDED COMPLAINT        -23-

1    care, particularly if they were not showing acute symptoms.

2    e.    On information and belief, Defendants have a policy and practice of

3          providing mental health treatment—primarily consisting of isolation

4          and restraint—only to patients who would meet the requirements for

5          involuntary detention under California Welfare and Institutions code

6          section 5150. This does not meet the Constitutional standard for the

7          provision of minimally adequate mental health treatment in Jail.

8    f.    Following Mr. Mayfield's return to the Jail after treatment for

9          restoration of competency at Napa State Hospital, Defendants failed to

10         provide Mr. Mayfield with necessary mental health treatment, causing

11         him to once again decompensate to the point where he was gravely

12         disabled and posed serious risk of harm to himself.

13   g.    Defendants failed to appropriately assess Mr. Mayfield's suicidality,

14         risk of harm to himself, and mental illness, and, instead, chose to

15         ignore his symptoms and refuse to provide him treatment.

16   h.    Despite Defendants' knowledge that Mr. Mayfield needed care, Mr.

17         Mayfield routinely experienced significant delays in receiving even the

18         minimal health treatment provided by Defendants. These delays

19         caused him further harm.

20   i.    Despite Defendants' knowledge that Mr. Mayfield had been subjected

21         to physical abuse including sexual assault by other inmates,

22         Defendants failed to assess the effects of that abuse on Mr. Mayfield's

23         mental health and risk for self-harm.

24   108.   By policy and practice, Defendants fail to provide adequate mental

25   health treatment to inmates with mental illness such as Mr. Mayfield, including but

26   not limited to: failure to provide appropriate medication and ensure timely

27   distribution of medication; failure to appropriately supervise and evaluate the

28   administration of medication; failure to provide a sufficient number of trained

mental health professionals; failure to set up an appropriate, systematic program for screening and evaluating inmates to identify those in need of mental health care; failure to institute a treatment program that involves more than the segregation and close supervision of mentally ill inmates; failure to provide appropriate treatment including counseling and therapy, failure to identify and provide appropriate clinical treatment to inmates in acute psychiatric crisis; failure to appropriately screen for suicidality, implement adequate suicide precautions or establish a basic program to identify, treat and supervise inmates at risk for suicide and; failure to provide appropriate follow-up treatment to inmates released from suicide watch .

109.   Defendants employ inadequate policies, procedures, and practices for identifying inmates in need of medical and mental health treatment and providing appropriate medical and mental health treatment. Defendants also fail to appropriately train and supervise staff regarding the provision of treatment to inmates with medical and mental health issues, especially if the mental illness presents is not presently acute.

110.   Defendants have consistently failed to meet their constitutional obligation to provide adequate medical and mental health care to prisoners in their jails. The mental health care provided by Defendants to prisoners in their jails is woefully inadequate and falls far short of all of the minimum elements of a constitutional mental health care system. Defendants' failure to correct their policies, procedures, and practices, despite notice of significant and dangerous problems, evidences deliberate indifference in the provision of mental health treatment.

111.   Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to provide Mr. Mayfield with appropriate medical or psychiatric care and to identify suicide risk, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to identify suicide risk and provide treatment, constituted

1    deliberate indifference to Mr. Mayfield's serious medical needs, health and safety.

2         112.   All of the acts of the persons involved in Mr. Mayfield's care were

3    done under color and pretense of the statutes, ordinances, regulations, customs,

4    official policies, official procedures, and usages of the County of Sacramento.

5         113.   On information and belief, Mr. Mayfield alleges that the County of

6    Sacramento has allocated insufficient financial and material resources to the County

7    Sheriff to allow the County Sheriff to properly care for the mental health needs of

8    inmates while complying with other statutory mandates.  In addition, Defendants

9    Jones, Lewis and Pattison, who all have budgetary authority in the allocation and

10   spending of money given to the Sheriff for operation of the County Jail, have

11   allocated insufficient funding and material resources to mental health personnel for

12   the care and treatment of persons who have serious mental illness, especially if the

13   mental illness presents itself in a non-acute fashion.

14        114.   The net result of this policy of underfunding and insufficient training is

15   that inmates' mental health conditions worse while under Defendants' care and, in

16   situations such as Mr. Mayfield's, inmates injure themselves.

17        115.   As a direct and proximate result of Defendants' actions, Mr. Mayfield

18   suffered bodily injury, emotional distress, loss of the enjoyment of life, and

19   numerous other forms of damage.

20        116.   Defendants' actions were malicious, oppressive and/or in reckless

21   disregard of the Plaintiff's rights, thereby justifying an award to Plaintiff of

22   exemplary or punitive damages to punish the wrongful conduct alleged herein and

23   to deter such conduct in the future.

24   / / /

25   / / /

26   / / /

27

28

_____
SECOND AMENDED COMPLAINT          -26-

1

## Fourth Cause of Action

**Failure to Protect from Harm in violation of the Fourteenth Amendment to the United States Constitution (42 U.S.C. §1983, 42 U.S.C. §15601, et al.) (Plaintiff James Joshua Mayfield against Defendants Jones, Lewis, Pattison, County of Sacramento, Dr. Gregory Sokolov, Does 1-5, and Regents of the University of California)**

117.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

118.   Defendants could have taken action to prevent unnecessary harm to Mr. Mayfield, but refused or failed to do so. As a result, Mr. Mayfield was severely and permanently injured in July 2013.

119.   Defendants failed to have minimally necessary policies and procedures concerning the adequate identification and housing of Mr. Mayfield, whom they knew or should have known to be at risk of self-harm and vulnerable to harm from other inmates.

120.   Defendants also failed to implement minimally sufficient policies and procedures to protect Mr. Mayfield from harm. Defendants failed to appropriately train and supervise staff regarding identification and handling of detainees at risk of harm.

121.   Defendants failed to protect Mr. Mayfield from harm on numerous occasions, including but not limited to Defendant Orozco's November 2012 assault, the sexual assaults on Mr. Mayfield by other inmates and Mr. Mayfield's July 2013 suicide attempt and paralyzing injury. Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to take appropriate measures to protect Mr. Mayfield from harm, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to protect Mr. Mayfield from harm, constituted deliberate indifference to Mr. Mayfield's health and safety.

122.   As a direct and proximate result of Defendants' conduct, Mr. Mayfield experienced physical pain, severe emotional distress, and mental anguish during his incarceration. Mr. Mayfield continues to suffer physical pain, severe emotional distress, and mental anguish as a result of his life-altering injuries.

123.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiff's rights, thereby justifying an award to Plaintiff of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Fifth Cause of Action

**Deprivation of Substantive Due Process Rights in Violation of First and Fourteenth Amendments of the United States Constitution – Loss of Familial Companionship (42 U.S.C. §1983)**

**(Plaintiffs James Allison Mayfield Jr. and Terri Mayfield against Defendants Jones, Lewis, Pattison, County of Sacramento, Dr. Gregory Sokolov, Does 1-5, and Regents of the University of California)**

124.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

125.   The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to Mr. Mayfield's serious medical needs, health and safety, violating Mr. Mayfield's constitutional rights, and their failure to train, supervise, and/or take other appropriate measures to prevent the acts and/or omissions that caused Mr. Mayfield's serious injuries deprived Plaintiffs James Allison Mayfield, Jr. and Terri Mayfield of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

126.   As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein.

/ / /

127.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiffs' rights, thereby justifying an award to Plaintiffs of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Sixth Cause of Action**

**Medical Malpractice (California State Law)**

**(Plaintiff James Joshua Mayfield against Defendants Regents of the University of California, Does 1-5, and Dr. Gregory Sokolov)**

128.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

129.   Defendants failed to comply with professional standards in the treatment of Mr. Mayfield's serious mental illness by failing to appropriately assess and evaluate his mental health and suicide risk, failing to take appropriate and timely suicide prevention measures, prematurely removing Mr. Mayfield from suicide watch and returning him to an unsafe cell, failing to provide appropriate mental health treatment, and failing to prescribe or provide appropriate and necessary psychiatric medications and ensure compliance with those medications.

130.   Defendants also failed to appropriately supervise, review, and ensure the competence of medical staff's and custody staff's provision of treatment to Mr. Mayfield, and failed to enact appropriate standards and procedures that would have prevented such harm to him.

131.   As a direct and proximate cause of this negligence and failure to meet their professional standards of care, Mr. Mayfield and Plaintiffs James A. Mayfield and Terri Mayfield suffered injuries and damages as alleged herein.

132.   The negligent conduct of these Defendants was committed within the course and scope of their employment.

133.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiffs' rights, thereby justifying an award to Plaintiffs of

exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Seventh Cause of Action

**Failure to Furnish/Summon Medical Care (California State Law)**

**(Plaintiff James Joshua Mayfield against Defendants Jones, Lewis, Pattison, County of Sacramento, Dr. Gregory Sokolov, Does 1-5, and Regents of the University of California)**

134.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

135.   Defendants owed Mr. Mayfield a duty of care to provide him immediate medical and mental health care.

136.   The conduct of Defendants alleged herein, including but not limited to the facts that Defendants knew or had reason to know that Mr. Mayfield was in need of immediate medical and mental health care and that Defendants failed to take reasonable action to summon or provide that care, resulting in Mr. Mayfield's permanent and severe injury as alleged herein, violated California state law, including Cal. Govt. Code §§ 844.6 and 845.6.

137.   Defendants also failed to timely and appropriately respond to Mr. Mayfield's repeated expressions of suicidal ideation.

138.   The alleged conduct of Defendants was committed within the course and scope of their employment.

139.   As a direct and proximate result of Defendants' breach, Mr. Mayfield suffered injuries and damages causing great pain, as alleged herein.

140.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiffs' rights, thereby justifying an award to Plaintiffs of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

/ / /

## Eighth Cause of Action

## Assault (California State Law)

**(Plaintiff James Joshua Mayfield against Defendants Orozco, Does 1-5, and the County of Sacramento)**

141.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

142.   Defendant Orozco's above-described actions in November 2012 constituted intent to place Mr. Mayfield in immediate fear of an offense contact upon his person.  Defendant Orozco's conduct also constituted intent to cause a harmful offensive contact upon Mr. Mayfield's person. Defendant Orozco did not have consent, authority, or necessity to justify his conduct.

143.   Mr. Mayfield was placed in fear of an offensive contact upon his person when Defendant Orozco offensively touched him in the manner described above and also when he caused him his injuries in November 2012.

144.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiff's rights, thereby justifying an award to Plaintiff of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Ninth Cause of Action

## Battery (California State Law)

**(Plaintiff James Joshua Mayfield against Defendants Orozco, Does 1-5, and the County of Sacramento)**

145.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

146.   Defendant Orozco, without cause or justification, touched Mr. Mayfield with the intent to harm or offend him in November 2012.

147.   Mr. Mayfield did not consent to the touching,

148.   Mr. Mayfield was harmed by the touching.

SECOND AMENDED COMPLAINT                -31-

149.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiff's rights, thereby justifying an award to Plaintiff of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Tenth Cause of Action**

**Violation of the Bane Act, Civil Code §52.1 (California State Law)**

**(Plaintiff James Joshua Mayfield against Defendants Orozco, Does 1-5, and the County of Sacramento)**

150.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

151.   Defendants, without cause or justification, acted intimidatingly, coercively, and violently against Mr. Mayfield and interfered with his civil rights in November 2012.

152.   Mr. Mayfield was harmed by these acts.

153.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiff's rights, thereby justifying an award to Plaintiff of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Eleventh Cause of Action**

**Negligence (California State Law)**

**(All Plaintiffs against All Defendants)**

154.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

155.   With respect to the November 2012 incident, Defendants County of Sacramento and Orozco owed a duty to Mr. Mayfield to treat him reasonably, humanely, and carefully while he was in their care. Defendants breached that duty, and Mr. Mayfield suffered injuries as a result.

/ / /

156.   With respect July 2013 incident, Defendants Jones, Lewis, Pattison, County of Sacramento, Regents of the University of California and Dr. Gregory Sokolov owed a duty to Mr. Mayfield and to all inmates to ensure that sufficient funds were allocated in order to institute appropriate programs designed to care for the mental health needs of inmates and that appropriate programs were instituted. In addition, Defendants had a duty to care for Mr. Mayfield's mental health needs utilizing the equipment, personnel, and facilities over which they had control. Defendants breached that duty, and Mr. Mayfield suffered injuries as a result.

157.   These same Defendants failed to comply with professional standards in the treatment of Mr. Mayfield's serious mental illness by failing to appropriately assess and evaluate his mental health and suicide risk, failing to take appropriate and timely suicide prevention measures, failing to place Mr. Mayfield in suicide watch, placing Mr. Mayfield in an unsafe cell, failing to provide appropriate mental health treatment, and failing to prescribe or provide appropriate and necessary psychiatric medications and ensure compliance with those medications.

158.   These Defendants also failed to appropriately supervise, review, and ensure the competence of medical staff's and custody staff's provision of treatment to Mr. Mayfield, and failed to enact appropriate standards and procedures that would have prevented such harm to him.

159.   Together, these Defendants acted negligently and improperly, breached their respective duties, and as a direct and proximate result, Plaintiffs suffered injuries and damages as alleged herein.

160.   The negligent conduct of Defendants was committed within the course and scope of their employment.

161.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiffs' rights, thereby justifying an award to Plaintiffs of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

1

**Twelfth Cause of Action**

2

**Negligent Supervision, Training, Hiring, and Retention (California State Law)**

3

**(All Plaintiffs against All Defendants)**

4       162.   Plaintiffs incorporate all of the above previous paragraphs as if fully

5   set forth herein.

6       163.   Defendants had a duty to hire, supervise, train, and retain employees

7   and/or agents so that employees and/or agents refrain from the conduct and/or

8   omissions alleged herein.

9       164.   Defendants breached this duty, causing the conduct alleged herein.

10      165.   Such breach constituted negligent hiring, supervision, training, and

11  retention under the laws of the State of California.

12      166.   As a direct and proximate result of Defendants' failure, Plaintiffs

13  suffered injuries and damages as alleged herein.

14      167.   Defendants' actions were malicious, oppressive and/or in reckless

15  disregard of the Plaintiffs' rights, thereby justifying an award to Plaintiff of

16  exemplary or punitive damages to punish the wrongful conduct alleged herein and

17  to deter such conduct in the future.

18

**Thirteenth Cause of Action**

19

**Dangerous Condition of Public Property**

20

**(Plaintiff James Joshua Mayfield against Defendants Jones, Lewis, Pattison,**

21

**County of Sacramento, Does 1-5, and Regents of the University of California)**

22      168.   Plaintiffs incorporate all of the above previous paragraphs as if fully

23  set forth herein.

24      169.   Defendants failed to ensure that Mr. Mayfield's inmate housing was

25  safe and not dangerous. In spite of having full knowledge of Mr. Mayfield's

26  suicidal ideation and his threat to jump off his bunk and injure himself, Defendants

27  took no steps to devise alternate sleeping arrangements so as to minimize, let alone

28  eliminate, the danger to Mr. Mayfield of his having a bunk bed in his cell.

170.   This dangerous condition was created by said Defendants and was a substantial factor in Mr. Mayfield injuring of himself.

171.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiff's rights, thereby justifying an award to Plaintiff of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Fourteenth Cause of Action**

**Intentional Infliction of Emotional Distress (California State Law)**

**(All Plaintiffs against All Defendants)**

172.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

173.   Defendants intentionally inflicted emotional distress on Plaintiffs by engaging in extreme and reckless behavior that intended to cause them emotional distress and/or acting with reckless disregard of the possibility that Plaintiffs would suffer emotional distress. Plaintiffs did in fact suffer emotional distress, and continue to suffer emotional distress, as a result of Defendants' conduct.

174.   As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiffs were injured as set forth above.

175.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiffs' rights, thereby justifying an award to Plaintiffs of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

/ / /

/ / /

/ / /

1

### Fifteenth Cause of Action

2

### Negligent Infliction of Emotional Distress (California State Law)

3

### (All Plaintiffs against all Defendants)

4   176.   Plaintiffs incorporate all of the above previous paragraphs as if fully

5   set forth herein.

6   177.   Defendants' conduct at issue herein was negligent. Plaintiffs suffered

7   significant emotional distress, and continue to suffer significant emotional distress.

8   Defendants' negligence was a substantial factor in causing Plaintiffs' serious

9   emotional distress.

10   ### PRAYER FOR RELIEF

11   WHEREFORE, Plaintiffs pray for the following relief:

12   1.   For compensatory, general and special damages against each

13   Defendant, jointly and severally, in an amount to be proven at trial;

14   2.   For damages related to the impact of Defendants' conduct on the

15   parent-child relationship between Plaintiffs James Allison Mayfield, Jr., Terri

16   Mayfield and Mr. Mayfield;

17   3.   General damages, including damages for physical and emotional pain,

18   emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness

19   and trauma and suffering, the loss of the services, society, care and protection of the

20   decedent, as well as the loss of financial support and contributions, loss of the

21   present value of future services and contributions, and loss of economic security;

22   4.   Prejudgment interest;

23   5.   For punitive and exemplary damages against each individually named

24   Defendant and the Regents of the University of California in an amount appropriate

25   to punish Defendant(s) and deter others from engaging in similar misconduct;

26   6.   For costs of suit and reasonable attorneys' fees and costs pursuant to

27   42 U.S.C. § 1988, and as otherwise authorized by statute or law;

28   7.   For restitution as the court deems just and proper;

8.     For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

### JURY DEMAND

Plaintiffs hereby request a jury trial in this matter.

Dated:  March 18, 2015                    Respectfully Submitted,

                                          RIFKIN LAW OFFICE

                                          HADSELL STORMER & RENICK LLP


                                          By:  _____
                                               Barbara Enloe Hadsell
                                               Dan Stormer
                                               Joshua Piovia-Scott
                                               Mohammad Tajsar
                                               Lori Rifkin
                                          Attorneys for Plaintiffs

SECOND AMENDED COMPLAINT          -37-