Barbara Enloe Hadsell, Esq. [S.B. #086021]
Dan Stormer, Esq. [S.B. #101967]
Joshua Piovia-Scott, Esq. [S.B. #222364]
Acrivi Coromelas, Esq. [S.B. #298305]
Caitlan McLoon, Esq. [S.B. #302798]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Tel: (626) 585-9600/Fax: (626) 577-7079
Emails: bhadsell@hadsellstormer.com
        dstormer@hadsellstormer.com
        jps@hadsellstormer.com
        acoromelas@hadsellstormer.com
        cmcloon@hadsellstormer.com

Lori Rifkin, Esq. [S.B. # 244081]
RIFKIN LAW OFFICE
P.O. Box 19169
Oakland, California 94619
Telephone: (415) 685-3591
Email: lrifkin@rifkinlawoffice.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Estate of JAMES JOSHUA MAYFIELD, by and through LISA BERG, as Conservator; JAMES ALLISON MAYFIELD, JR.; and TERRI MAYFIELD, <br><br> Plaintiffs, <br><br> vs. <br><br> IVAN OROZCO, in his individual capacity; SHERIFF SCOTT JONES, in his individual and official capacity; JAMES LEWIS, in his individual and official capacity; RICK PATTISON, in his individual and official capacity; COUNTY OF SACRAMENTO; UNIVERSITY OF CALIFORNIA DAVIS HEALTH SYSTEM; DR. GREGORY SOKOLOV, in his individual capacity; DR. ROBERT HALES, in his individual capacity; and Does 1-5, <br><br> Defendants. | Case No.: CV-02499-JAM-AC <br> [Assigned to the Honorable John A. Mendez – Courtroom 6] <br><br> [PROPOSED] FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL <br><br> 1. Excessive Force (Fourth Amendment) <br> 2. Unreasonable Search and Seizure (Fourth Amendment) <br> 3. Failure to Provide Medical Care (Fourteenth Amendment) <br> 4. Failure to Protect from Harm (Fourteenth Amendment) <br> 5. Deprivation of Substantive Due Process (First and Fourteenth Amendments) <br> 6. Disability Discrimination (ADA and Rehabilitation Act) <br> 7. Medical Malpractice <br> 8. Failure to Furnish Medical Care <br> 9. Assault <br> 10. Battery <br> 11. Civil Code §52.1 <br> 12. Negligence <br> 13. Negligent Supervision, Training, Hiring, and Retention <br> 14. Dangerous Condition on Public Property <br> 15. Intentional Infliction of Emotional Distress <br> 16. Negligent Infliction of Emotional Distress |

1

**INTRODUCTION**

2       1.      On July 17, 2013, 20-year-old James Mayfield, a pre-trial detainee at

3   the Sacramento County Jail, attempted to commit suicide by diving head first from

4   his bunk bed to the floor of his cell. Although he did not die, he suffered a

5   significant spinal injury that left him paralyzed and cognitively impaired for the rest

6   of his life. Defendants were aware that Mr. Mayfield had been diagnosed with

7   serious mental illness. Defendants had also identified Mr. Mayfield as a suicide

8   risk, knew that he had repeatedly attempted to commit suicide while in Jail, and

9   were aware that he had specifically threatened to jump off his bunk to do so.

10  Defendants also knew that Mr. Mayfield had repeatedly been subjected to physical

11  attacks at the Jail, including an assault by Jail correctional officers and sexual

12  assaults by other inmates. Despite this knowledge, Defendants failed to provide Mr.

13  Mayfield with appropriate mental health care, failed to take adequate steps to

14  protect him from harm, including self-harm, and, in fact, affirmatively placed Mr.

15  Mayfield in danger by placing him in a cell with known suicide hazards.

16      2.      Defendant Ivan Orozco, one of the Jail's correctional officers, brutally

17  assaulted Mr. Mayfield on November 22, 2012, repeatedly kicking and kneeing him

18  in the head while he lay on the ground. After the assault, Mr. Mayfield's already

19  tenuous mental health deteriorated even faster. He smeared his own feces all over

20  his face and body and was found with a plastic deodorant container lodged in his

21  rectum. He reported that he had been repeatedly raped by other inmates. Defendants

22  remained deliberately indifferent to Mr. Mayfield's mental health needs and

23  potential for suicide despite his worsening condition, including affirmatively

24  preventing his admission to the Jail's psychiatric unit, and their conduct culminated

25  in his suicide attempt and subsequent paralysis.

26      3.      Mr. Mayfield was released from Jail soon after his suicide attempt and

27  injury. He now lives with his parents, whose relationship with their son has not only

28  been significantly impacted by his permanent psychological and physical

---

FOURTH AMENDED COMPLAINT          -1-

impairments, but who are required by California law to provide him with the 24 hour-a-day care that he will need for the rest of his life.

## JURISDICTION

4.      This Complaint seeks damages for violations of the civil rights, privileges, and immunities guaranteed by the First, Fourth and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, and for violations of California state law.

5.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, because the claims form part of the same case or controversy arising under the United States Constitution and federal law.

## VENUE

7.      Plaintiffs' claims arose in the County of Sacramento, California. Venue therefore lies in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(2).

## PARTIES

8.      James Joshua Mayfield is a 22-year-old citizen of the United States who was incarcerated at the Sacramento County Jail in Sacramento, California, at the time of the incidents described herein.  Mr. Mayfield currently resides in San Joaquin County, California with his parents.  Plaintiff Lisa Berg, as Conservator of the Estate of James Joshua Mayfield, brings this action pursuant to California Code of Civil Procedure section 372(a)(1).  The Superior Court of California, County of San Joaquin, appointed Ms. Berg as the Conservator of Mr. Mayfield's Estate on May 9, 2016.  A true and correct copy of the executed Letters of Conservatorship as to Ms. Berg is attached hereto as Exhibit 1.

9.      Plaintiff James Allison Mayfield, Jr. is the father of James Joshua

Mayfield. He is suing individually for violations of civil rights under the First and Fourteenth Amendments.  Additionally, the Superior Court of California, County of San Joaquin, appointed James Allison Mayfield as the Conservator of Mr. Mayfield's Person on May 23, 2016.  A true and correct copy of the executed Letters of Conservatorship as to James Allison Mayfield is attached hereto as Exhibit 2.  Despite this designation, James Allison Mayfield participates in this action only in his individual capacity.

10.     Plaintiff Terri Lynn Mayfield is the stepmother of James Joshua Mayfield. She is suing individually for violations of civil rights under the First and Fourteenth Amendment.

11.     Defendant County of Sacramento is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of Sacramento operates and manages the Sacramento County Jail and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the Sacramento County Sheriff's Department and the Sacramento County Jail, and each entity's respective employees and/or agents. The Sacramento County Sheriff's Department operates the Sacramento County Jail, and is and was responsible for ensuring the provision of emergency and medical and mental health care services to all Sacramento County Jail inmates.

12.     Defendant Ivan Orozco is, and was at all relevant times mentioned herein, an officer in the Sacramento County Sheriff's Office. While on shift at the Jail, he was and is responsible for the safety and security of inmates and ensuring that their constitutional rights are protected. On November 22, 2012, Defendant Orozco assaulted Mr. Mayfield and violated his constitutional rights. Defendant Orozco is being sued in his individual capacity.

13.     Defendant Scott Jones is, and was at all relevant times mentioned herein, the Sheriff of the County of Sacramento, the highest position in the

FOURTH AMENDED COMPLAINT        -3-

Sacramento County Sheriff's Department. As Sheriff, Defendant Jones is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all Sacramento County Sheriff's Department custodial employees and/or agents. Defendant Jones is and was charged by law with the administration of the Sacramento County Jail, and is responsible for safety and security of inmates housed at the Jail.  Defendant Jones also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sacramento County Sheriff's Department alleged herein were committed. Defendant Jones is being sued in his individual and official capacities.

14.     Defendant James Lewis is, and was at all times relevant herein, the Sacramento County Chief of Corrections. Defendant Lewis is being sued in his individual and official capacities.

15.      Defendant Rick Pattison is, and was at all times relevant herein, the Sacramento County Commander of the Main Jail Division. Defendant Pattison is being sued in his individual and official capacities.

16.     Defendant University of California Davis Health System runs the Jail Psychiatric Service, which contracts with the Sacramento County Sheriff's Department to provide inpatient and outpatient mental health services to inmates incarcerated in the Sacramento County Jail.

17.     Defendant Dr. Gregory Sokolov, M.D. is a Health Sciences Clinical Professor at the University of California at Davis Department of Psychiatry and Behavioral Sciences and is the Medical Director of the Sacramento County's Jail Psychiatric Service.  Dr. Sokolov is responsible for provision of mental health services at the Jail, the policies, procedures, and practices of the Jail Psychiatric Service, and the supervision, discipline, and training of Jail Psychiatric Services staff.  Defendant Sokolov is being sued in his individual capacity.

18.     Defendant Dr. Robert E. Hales, M.D. is the Chair of the Department of

Psychiatry and Behavioral Services for the University of California Davis.  In this position, Dr. Hales oversees and is responsible for the administration, policies, procedures, and practices of the Jail Psychiatric Service, which contracts with the Sacramento County Sheriff's Department to provide inpatient and outpatient mental health services to inmates incarcerated in the Sacramento County Jail.  Dr. Hales is also responsible for the supervision and discipline of University of California Davis staff and employees who work therein.  Defendant Hales is being sued in his individual capacity.

19.    Defendants Does 1-5 are custody and/or medical staff at Sacramento County Jail who were responsible for the safety and security of Mr. Mayfield and/or providing him with adequate health treatment. Defendants Does 1-5 supervised and/or participated in the events complained of herein. At the present time, the identities of Does 1-5 are unknown and not discoverable to Plaintiffs. Plaintiffs will substitute the true names of Does 1-5 when Plaintiffs are able to ascertain their identities through discovery. Does 1-5 are sued in their individual capacities.

20.    Plaintiffs are informed and believe and thereon allege that at all times mentioned in this Complaint, Defendants, and each of them, were the agents, employees, servants, joint venturers, partners and/or co-conspirators of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

## FACUAL ALLEGATIONS

21.    James Allison Mayfield, Jr. is the father of James Joshua Mayfield. He has held a California State license as painter for 32 years, ran a successful painting contracting business, and held a leadership position in his church for 15 years before being forced to abandon his business and church activities to care for his son. Terri Lynn Mayfield is James Joshua Mayfield's step-mother. She has served as the Choir Director in the family's church since 2007 and previously assisted

James Allison Mayfield, Jr. with his painting business before the family was forced to close it down. James Joshua Mayfield lived with his father, step-mother and siblings in the suburbs of San Jose and was a diligent and successful student and athlete before being tragically injured in a high school football game.

## I.   Mayfield Suffers a Significant Head Injury During a High School Football Game and Begins to Have Mental Health Issues

22.    On November 3, 2007, the month before he turned 15 years old, Mr. Mayfield suffered a significant head injury during a high school football game. He initially experienced a cerebral concussion and then minutes later suffered a series of at least five grand mal seizures. He was taken to the emergency room, where medical staff was unable to stabilize him and was forced to induce a coma. He was eventually brought out of the coma but was never the same again.

23.    Mr. Mayfield's injury occurred during the last game of his freshman year at Mount Pleasant High School in San Jose, California. Mr. Mayfield was named the freshman player of the year and chosen for the all-league team. The year before, he had been selected as the MVP of his school's basketball team and the player of the year in the basketball league. In addition to his athletic success, Mr. Mayfield had been a diligent student and was carrying a 3.4 grade point average at the time of the head injury.

24.    Not only was Mr. Mayfield unable to participate in organized sports after his head injury, but his grades started to go down and he began having behavioral issues that he had never had before. By the end of his freshman year, his grade point average had plummeted to 2.3. He was depressed, angry and aggressive in ways he had never been before. His attention, concentration and memory were significantly impaired, and he expressed suicidal thoughts for the first time. Although he had never previously had issues with the law or his school, he was suspended from school and arrested for the first time in the Spring of 2008.

25.    A psychologist who examined Mr. Mayfield in April 2008 after his

FOURTH AMENDED COMPLAINT          -6-

first arrest concluded that Mr. Mayfield had "severe" cognitive difficulties that were caused by the head injury he suffered in November 2007. At the urging of the psychologist, Mr. Mayfield's parents removed him from school and hired a private teacher to home school him. They also enrolled Mr. Mayfield in anger management therapy, participated in weekly family therapy sessions and worked closely with Mr. Mayfield's educators to ensure he was receiving the appropriate instruction.

26.    Mr. Mayfield's condition continued to worsen despite his family's efforts and support. Mr. Mayfield was diagnosed as paranoid schizophrenic and began taking low doses of psychotropic medication.

27.    Medical records for Mr. Mayfield indicate that he attempted to commit suicide on at least four separate occasions and was placed on an involuntary psychiatric hold pursuant to California Welfare and Institutions Code section 5150 just prior to his incarceration in the Sacramento County Jail. Mr. Mayfield's parents provided Defendants with these medical records before the November 2012 assault and the July 2013 suicide attempt.

**II.    Defendants Are Repeatedly Put on Notice that Mr. Mayfield is Suicidal but Fail to Adequately Address This and His Other Mental Health Needs**

28.    Mr. Mayfield was arrested and incarcerated in the Sacramento County Jail on or about June 5, 2011. Mr. Mayfield's parents, particularly his father, visited him almost every week, provided Defendants with information and records regarding Mr. Mayfield's psychiatric history and condition and worked closely with his criminal defense attorneys in an attempt to make sure that Mr. Mayfield was receiving appropriate treatment while in the Jail.

29.    Defendants were deliberately indifferent to Mr. Mayfield's serious mental health needs despite repeated notice that he was suicidal and had significant mental health issues, as detailed in the following paragraphs.

30.    A July 7, 2011 psychiatric evaluation conducted at the request of the Sacramento Superior Court summarized Mr. Mayfield's psychiatric history,

including his diagnosis of paranoid schizophrenia and history of at least four suicide attempts, and concluded that he had a "moderate to high risk of violence toward himself and others in both the short and long term." The evaluating doctor further concluded that Mr. Mayfield was not competent to stand trial on the criminal charges that had been brought against him, that he had no capacity to make decisions about his medications or treatment, and confirmed the previous diagnoses of paranoid schizophrenia.

31.     In an August 6, 2011 report for the Superior Court, another mental health professional who examined Mr. Mayfield recounted his history of self-harm and documented that he "was responding to internal stimuli" and appeared to be hallucinating during their interview. The psychologist confirmed that Mr. Mayfield was schizophrenic and concluded that his psychiatric condition was worsening.

32.     On or about August 13, 2011, Mr. Mayfield attempted to run away from one of the deputies when the deputy was escorting him back to his cell. Defendants claimed that they needed to use pepper spray in order to control Mr. Mayfield and that he told them that "I am hearing voices and the voices told me to take your keys and run so that I could escape." Defendants' records also indicate that Mr. Mayfield informed them that he felt suicidal.

33.     On August 15, 2011, Defendants identified Mr. Mayfield as a danger to himself and "gravely disabled." He was sent to the Jail's inpatient psychiatric unit and then discharged back to the general population on August 18. Defendants' records indicate that Mr. Mayfield did not receive any mental health treatment between August 18 and September 3, 2011.

34.     On September 3, 2011, Mr. Mayfield again informed Defendants that he was "having suicidal thoughts" and "wanted to hurt himself." Defendants responded by handcuffing him and placing him in a classroom.

35.     On information and belief, Defendants' primary practice for addressing potentially suicidal inmates is to handcuff them in a classroom until they

1  can be assessed by qualified psychiatric staff. This classroom is inadequately

2  equipped to house suicidal inmates and, among other things, does not contain

3  running water, a bed or a toilet. Due to understaffing, mentally ill inmates,

4  including Mr. Mayfield, are repeatedly subjected to this process and regularly spend

5  long periods of time restrained in the classroom waiting for psychiatric treatment

6  after expressing suicidal ideations. On information and belief, suicidal inmates are

7  regularly restrained in the classroom for as long as two days, a strategy Defendants

8  refer to as "classroom therapy," whereby Defendants seek to pressure the inmates to

9  deny they are suicidal so that they can be denied admission to the psychiatric unit

10 and returned to the general population without treatment.

11      36.    Although Sacramento County's correctional facilities had an average

12 daily population of 4,046 inmates in 2012, there are only 18 beds in the system's

13 one inpatient Psychiatric Services Unit. The Sacramento County Sheriff's

14 Department's 2013 report titled "A Proactive Response to Public Safety

15 Realignment" confirms these numbers and adds that "Due to the limited capacity

16 [of the Inpatient Psychiatric Services Unit], there is often a waiting list for

17 admission to this Unit."

18      37.    Despite the fact that he continued to inform Defendants that he was

19 suicidal, Mr. Mayfield was denied psychiatric care on September 3, 2011 and

20 returned to the general population.  There is no indication in Defendants' records

21 that Mr. Mayfield received any additional treatment or was evaluated by a doctor in

22 connection with his September 3, 2011 report that he was suicidal.

23      38.    On or about September 29, 2011, Mr. Mayfield was admitted to the

24 California Department of Mental Health Hospital in Napa in order to restore his

25 competency to stand trial. After receiving treatment and medication at the hospital

26 for approximately two months, Mr. Mayfield was found to be competent to stand

27 trial on November 22, 2011 and returned to the Sacramento County Jail soon

28 thereafter. The doctors in Napa diagnosed Mr. Mayfield as paranoid schizophrenic

1   and documented his hallucinations and paranoid delusions. Other than the therapy

2   and other non-medication treatment he received during the two months he spent at

3   the Napa Hospital, Defendants' treatment of Mr. Mayfield was almost exclusively

4   limited to administering medications.

5        39.    Defendants' records indicate that Mr. Mayfield did not receive any

6   additional mental health treatment when he was returned to Sacramento County Jail

7   at the end of 2011. Without treatment, his mental health once again decompensated,

8   and on March 22, 2012, Mr. Mayfield again informed Defendants that he was

9   suicidal and then urinated on an electrical outlet and started a fire.

10       40.    On March 23, 2012, Mr. Mayfield was admitted to the Jail's inpatient

11  psychiatric facility on the basis that he was a danger to himself. Mr. Mayfield was

12  housed in the psychiatric unit from March 23, 2012 to April 24, 2012. Jail deputies

13  admit to striking Mr. Mayfield 3-4 times in the head and face on March 25, while

14  he was housed in the psychiatric unit, claiming that Mr. Mayfield lunged at them.

15  There is no record indicating that he was examined for injury as a result of this

16  attack or that he received any additional treatment.

17       41.    On May 9, 2012, approximately two weeks after Mr. Mayfield had

18  been released from the psychiatric unit, Jail staff reported that Mr. Mayfield

19  informed them that he was "hearing voices telling him to jump/bang his head/kill

20  himself." He told psychiatric unit personnel that voices were "telling him to jump

21  off the upper tier . . . [and that] he cannot resist these voices." Mr. Mayfield was

22  again identified as a danger to himself and "gravely disabled" and was placed in a

23  safety suit and handcuffed in a Jail classroom. He informed Jail personnel that he

24  had attempted suicide on 27 previous occasions.

25       42.    Mr. Mayfield was admitted to the psychiatric unit on May 10, 2012.

26  On May 11, 2012, a psychiatrist from the UC Davis Department of Psychiatry

27  submitted a psychiatric evaluation of Mr. Mayfield at the request of the Superior

28  Court. This evaluation states that Mr. Mayfield reported that he had suicidal

FOURTH AMENDED COMPLAINT        -10-

ideations and concluded that he had a history of suicidal ideation and was a "moderate suicide risk." The psychiatrist diagnosed Mr. Mayfield as schizophrenic with hallucinations and paranoid delusions.

43.     On May 14, 2012, Defendants observed Mr. Mayfield repeatedly tearing his own foreskin and pounding the door in his cell. On May 15, Mr. Mayfield again informed Jail personnel that voices had been telling him to jump off the tier and kill himself. In a psychiatric progress note on the same date, the evaluating doctor noted that Mr. Mayfield had engaged in self-injurious behavior the day before, that his "acute suicide risk is high" and that his actions "suggest a need for further observation."

44.     Despite the psychiatrist's May 15, 2012 assessment that Mr. Mayfield was at acute risk for harm and required further observation, Defendants discharged Mr. Mayfield from the inpatient unit the very next day. On the May 16, 2012 form authorizing Mr. Mayfield's discharge from the psychiatric unit, Defendants further noted that Mr. Mayfield reported that he had a "plan to jump off top tier or bang his head" and that he had been hearing voices for the last three weeks telling him to kill himself by jumping off the top tier. Despite this, Mr. Mayfield did not receive any additional treatment and was returned to general population.

45.     Defendants' records indicate that on October 12, 2012, Mr. Mayfield pressed his emergency cell button and informed Defendants that he was suicidal, hearing voices and that he planned on choking himself to death. However, Defendants did not transfer him to the psychiatric unit or place him on the waiting list for the unit.

46.     On October 13, 2012, Mr. Mayfield informed Jail personnel that he had attempted suicide while housed in the psychiatric unit in May 2012 and stated that he "had plans to jump off his bunk or another high place [to commit suicide] if given the chance." Defendants placed Mr. Mayfield on the waiting list for the psychiatric unit.

FOURTH AMENDED COMPLAINT          -11-

47.   On October 14, Mr. Mayfield continued to report that he was hearing voices and had suicidal urges and Defendants concluded that he remained a danger to himself.

48.   On October 15, 2012, Jail Psychiatric Services noted that Mr. Mayfield had attempted suicide at least three times previously and that the last attempt had been made within the last year. Despite this knowledge, Defendants discharged Mr. Mayfield from the psychiatric unit and returned him to general population that day.

### III.   Defendants Assault Mayfield

49.   Defendant Ivan Orozco, a deputy in the Sacramento County Jail, assaulted Mr. Mayfield on or about November 22, 2012.

50.   According to Defendants' records of the incident, Mr. Mayfield went to retrieve the snack he was assigned as treatment for his diabetes at around 9:45 p.m. However, Mr. Mayfield was unable to open the door to enter the area where he was to receive the snack and he threw his hands up and began mumbling to himself in frustration. After Defendant Orozco opened the door for Mr. Mayfield, Defendant Orozco pushed him to the ground. When Mr. Mayfield got up, Defendant Orozco threw him back to the ground. Defendant Orozco admits that he then kicked Mr. Mayfield in the face "several times" while Mr. Mayfield was on the ground. Defendant Orozco further admits that after repeatedly kicking Mr. Mayfield in the face, he then "kneed [Mr. Mayfield] in the head and shoulder area approximately four times." Defendants' records indicate that the assault was captured on at least two of the video cameras located in the Jail.

51.   As a result of this incident Mayfield suffered physical injuries including, but not limited to, numerous scrapes, severe bruising, and a laceration on his lip which required seven stitches to close. Despite these injuries, Mr. Mayfield was not hospitalized and was merely given Tylenol for the pain.

52.   Defendants failed to assess the impact of this incident on Mr. Mayfield's mental health or provide him with any additional evaluation or

1
2
3

treatment. Defendants failed to take any additional actions even though this incident included repeated strikes to Mr. Mayfield's head and Defendants were aware that his mental illness had been originally caused by a traumatic head injury.

4
5
6

53.    None of the deputies involved in the assault, including Defendant Orozco, required medical attention for the alleged injuries they suffered during this incident.

7
8
9
10
11
12

54.    Mr. Mayfield was charged with battery against a police officer in violation of Penal Code 243(C)(2) in connection with this incident. On information and belief, these charges were later dropped at the preliminary hearing after the prosecutor reviewed the videos of the incident and made statements to the effect that, based on the conduct of the deputies who assaulted Mr. Mayfield, she could not move forward with the criminal charges against him.

13
14
15
16
17

55.     On information and belief, Defendants subjected Mr. Mayfield to additional retaliatory actions after this incident and the district attorney's refusal to bring criminal charges. Although his family had visited Mr. Mayfield regularly after his incarceration in Sacramento, he was not allowed to have visitors for approximately six weeks after the assault.

18
19
20

56.    The November 2012 assault and subsequent retaliation was a breaking point for Mr. Mayfield. He lost all trust in Defendants and any hope that his mental health would improve while in custody.

21
22

IV.    **Mayfield's Mental Health Continues to Deteriorate and Defendants Fail to Take Appropriate Suicide Precautions**

23
24
25
26
27
28

57.    On January 22, 2013, two months after Defendants' brutal assault on Mr. Mayfield, Jail personnel reported finding Mr. Mayfield "completely covered in feces from head to toe. Mayfield had feces smeared around his face, including his mouth and there were small chunks of feces in his hair. . . I asked him what was wrong and he told me he was suicidal." When he was taken to wash the feces off his body, Jail staff found a plastic deodorant stick lodged in his rectum.

FOURTH AMENDED COMPLAINT          -13-

1   58.   Defendants' records reflect that when Mr. Mayfield was asked why he

2   had covered himself in his own feces, he stated that he was trying to make himself

3   sick and that he had been "beat up bad." Mr. Mayfield further informed Jail

4   personnel that he was "sick of living" and reported that other inmates were stealing

5   his thoughts when he slept.

6   59.   After Mr. Mayfield was admitted to the psychiatric unit on or about

7   January 22, 2013, he was found sobbing in his cell and informed Jail personnel that

8   he had been "raped daily" by two other inmates. Defendants noted that Mr.

9   Mayfield was "very distraught."

10   60.   Defendants failed to provide Mr. Mayfield with any therapeutic

11   treatment or counseling to address the sexual assaults he reported and the obvious

12   effects of these assaults on Mr. Mayfield's mental state. There is no indication in

13   the records provided by the Jail that Mr. Mayfield ever received any treatment in

14   connection with these issues, nor that Defendants investigated Mr. Mayfield's

15   complaints of sexual assault.

16   61.   Although Defendants' records reflect that Mr. Mayfield continued to

17   express suicidal thoughts, Defendants removed him from suicide precautions on

18   January 29, 2013.

19   62.   Defendants then discharged him from the psychiatric unit and returned

20   him to the general population on February 2, 2013. On information and belief, Mr.

21   Mayfield did not receive any additional treatment as a result of this disturbing

22   incident.

23   63.   Less than one month after being returned to the general population,

24   Jail personnel again reported that Mr. Mayfield was expressing suicidal ideation.

25   On February 24, 2013, Mr. Mayfield informed Jail personnel that "he was suicidal .

26   . . [and that] he tried to kill himself by sticking his head inside the toilet." During a

27   psychiatric assessment later that day, Mr. Mayfield informed a nurse that "I was

28   contemplating putting my face in the toilet" in an attempt to take his own life. Mr.

FOURTH AMENDED COMPLAINT        -14-

Mayfield also informed staff that "I put my face in a plastic bag 6 days ago" in another attempt to commit suicide. Despite these statements and Mr. Mayfield's recent history of suicide attempts at the Jail, including within the past week, the evaluating nurse indicated that Mr. Mayfield did not express suicidal ideation.

64.     In an April 24, 2013 psychiatric evaluation for Mr. Mayfield's criminal case, a forensic psychiatrist again concluded that Mr. Mayfield was not competent to stand trial on the criminal charges that had been brought against him. The evaluation stated that Mr. Mayfield had an "established history of violence including suicidality" and an active, psychotic mental disorder. The examiner further concluded that Mr. Mayfield was not malingering.

65.     Defendants' records indicate that on June 20, 2013, Jail personnel observed him tearing and braiding his blanket. He was admitted to the psychiatric unit based on suicide risk, but once again transferred back to general population on June 25, less than a month before the suicide attempt that would result in his paralysis.

66.     Defendants failed to take basic precautions with inmates who were suicidal and repeatedly failed to provide mentally ill inmates with adequate health care throughout Mr. Mayfield's time in the Sacramento County Jail. On information and belief, this included failing to provide any treatment other than medication, allowing individuals who were not licensed or trained to administer medications to administer medications, improperly administering medications, reducing the type of medications that were available, failing to adequately monitor suicidal inmates, failing to use safety suits and other safety precautions, using safety suits and other safety precautions as punishment, providing generic treatment plans that were not tailored to the individual patient's needs, over diagnosing patients as malingering, and providing insufficient follow-up for patients that had been admitted to the psychiatric unit. Many of these failures involved violations of, or changes to, existing policies that had been put in place to require adequate

treatment. This inadequate treatment and insufficient follow-up resulted in repeated cycling of patients, including Mr. Mayfield, into and out of the psychiatric unit. Defendants' failures also resulted in repeated suicide attempts and/or suicides, including by patients that had been accused of malingering.

67.     On one occasion, a mentally ill inmate was physically restrained for almost 24 hours without food, water, treatment or medication while staff waited for a response from a doctor who was in Las Vegas and not returning calls.

68.     On information and belief, there have been at least 14 suicides, and numerous other attempted suicides, in the Sacramento County Jail in the last 12 years.

69.     On information and belief, starting in or about June of 2013 Defendants placed a social worker with no medical training in the position of Program Director for the psychiatric unit at the Sacramento County Jail. Although this position had previously been assigned to a registered nurse who had purportedly been trained to care for patients and administer medications, the new Program Director did not have even this level of training or licensure. Despite the fact that she was not licensed to do so, the new Program Director began administering medications to the inmates, resulting in repeated medication errors. Nurses and other Jail personnel complained about this but nothing was done.

**V.     Mayfield is Placed on a "Do Not Admit" to the Psychiatric Unit List, Attempts Suicide and Becomes Paralyzed**

70.     On information and belief, Defendant Gregory Sokolov, the Medical Director for the County's Jail Psychiatric Services who is responsible for supervising the doctors in the psychiatric unit, placed Mr. Mayfield on a list of inmates who were not to be admitted to the psychiatric unit without Dr. Sokolov's express approval. While other inmates who were not on this list could be admitted to the psychiatric unit by any number of other staff members, Dr. Sokolov required his personal approval for the evaluation or admission of Mr. Mayfield because he

FOURTH AMENDED COMPLAINT          -16-

found Mr. Mayfield difficult and characterized him as "malingering." On information and belief, Dr. Sokolov's list, which was maintained on a Microsoft Word document that was regularly printed out and taped to the wall in the facility, was not governed by any policy or rule other than Dr. Sokolov's personal whims.

71.   As a result of being placed on Dr. Sokolov's "do not admit" list, Mr. Mayfield was housed in general population rather than the psychiatric unit in July 2013.

72.   Mr. Mayfield was allegedly part of what Defendants call an "outpatient program" in general population.  Inmates in the outpatient program in general population are supposed to be checked regularly and send requests for medical attention, known as "kites," to Jail staff if they are in distress.

73.   On information and belief, Mr. Mayfield repeatedly sent "kites" to Jail personnel during the weeks and days leading up to his July 17, 2013 suicide attempt in which he stated that he was suicidal and asked for psychological treatment. Jail personnel received these messages from Mr. Mayfield and indicated that they were urgent but Defendants did not respond. Mr. Mayfield's cries for help were ignored.

74.   Despite having specific notice that Mr. Mayfield was considering killing himself by jumping head-first onto the floor from a bunk or tier, and despite knowledge of Mr. Mayfield's extensive history of suicide attempts and subjection to trauma and assault at the Jail, Defendants housed him in a general population cell with a bunk bed and hard floors. Defendants kept Mr. Mayfield in this cell in July 2013 in spite of the kites he sent expressing suicidal ideation and requesting mental health care.

75.   On or about July 17, 2013, Mr. Mayfield apparently dove or otherwise propelled himself from his bunk bed onto the floor and sustained significant damage to his body and nervous system.

76.   Defendants' records indicate that at 2:04 a.m. on July 17, a Jail deputy observed that Mr. Mayfield was lying on the ground in his cell. The records do not

indicate that the deputy made any attempt to communicate with Mr. Mayfield at that time or investigate the situation further.

77.    One hour later, at 3:05 a.m., this same deputy was conducting a routine cell check when he noticed that Mr. Mayfield had not moved from the ground. Mr. Mayfield informed the deputy that "I jumped off the top of my bunk head first. I was trying to commit suicide. I was sick of dealing with the courts and being in jail. I can't move my arms or legs and my neck hurts."

78.    Mr. Mayfield was transferred to the hospital at UC Davis, where it was determined that he had sustained a spinal injury, including, but not limited to, a C5 burst fracture with retropulsion leading to tetraparesis with paraplegia and sensory deficits.

79.    Defendants did not inform Mr. Mayfield's parents of his suicide attempt or injuries. His parents did not learn of this event until approximately one week later when a nurse from the UC Davis hospital informed them that their son had been injured and was being treated there. Mr. Mayfield's father and step-mother took turns spending time with him in the hospital and made sure that one of them was there with him at all times.

80.    After Mr. Mayfield's parents learned of Mr. Mayfield's injuries and had the opportunity to review the treatment he was receiving, including medications, they raised concerns with the medical staff at UC Davis regarding the high dosages and types of psychotropic medications that he was being given. On or around August 21, 2013, Mr. Mayfield's parents met with the medical staff at UC Davis, who informed them that UC Davis had continued the same dosages and medications that Mr. Mayfield was prescribed at Sacramento County Jail. The UC Davis medical staff informed Mr. Mayfield's parents that these medications and/or dosages were, in fact, inappropriate, and that they would be adjusted. On information and belief, this inappropriate administration of psychotropic medications by Defendants to Mr. Mayfield is known to cause serious side effects,

1    including suicidal thoughts and ideation.

2        81.    Mr. Mayfield's injuries mean that he is bed-ridden and unable to feed,

3    clean, care for himself, or perform other activities of daily living. He now requires

4    constant intensive care.

5        82.    Following Mr. Mayfield's injuries, Defendants dropped most of the

6    charges against him, allowed him to plead no contest to one count of felony

7    robbery, gave him credit for the more than two years he had spent at the

8    Sacramento County Jail and released him to the custody of his father and step-

9    mother with the express understanding that they would assume all of the

10   responsibility for his medical care.

11       83.    In order to provide the necessary care for Mr. Mayfield, Mr.

12   Mayfield's father closed his painting business and resigned the leadership position

13   he had held for more than 15 years at his church. James and/or Terri Mayfield now

14   dedicate themselves full-time or nearly full-time to their son's care.  The family had

15   to purchase medical equipment that would allow Mr. Mayfield to live at their home,

16   including a hospital bed, oxygen dispenser and a wheelchair. Before his discharge

17   from the hospital, James and Terri Mayfield trained with nurses there for 2-4 hours

18   a day for 8 weeks, learning, among other things, how to perform Mr. Mayfield's

19   bowel care, attach and remove his catheter, prevent bed sores and infections, and

20   administer his numerous medication injections. Mr. Mayfield's father and

21   stepmother are now his full-time caregivers and essentially devote 24 hours a day to

22   their son's medical needs. After repeatedly checking on Mr. Mayfield and adjusting

23   his medication during the night, the day begins at 7:30 a.m. when James and/or

24   Terri checks and administers Mr. Mayfield's medication, prepares and feeds him

25   his breakfast, changes his diaper and catheter, dresses him, stretches, massages and

26   exercises Mr. Mayfield, monitors blood sugar and urine level in urine collection

27   bag, and engages in other activities necessary for the day. This regimen takes place

28   every day and lasts from morning until late into the evening, averaging more than

fourteen hours of direct care per day. When one parent is outside of the house or otherwise needs to be relieved from performing caregiving duties, the other parent must perform all of these services.  James and/or Terri also take care of scheduling all of Mr. Mayfield's medical, mental health, and rehabilitative appointments, tracking and ordering prescriptions and supplies, and communicating with service providers.

84.     Mr. Mayfield entered the Sacramento County Jail at 18 years old, fully capable of most physical activities. He could walk, run, jump, skip and dance. When Defendants discharged Mr. Mayfield from their custody two and a half years later, he was paralyzed from his neck down and unable to even feed himself or walk.

85.     The lack of appropriate mental health treatment provided at the Jail combined with the physical and psychological abuse to which Defendants subjected him severely exacerbated Mr. Mayfield's mental illness, and led to the repeated decompensation of his mental health, and, ultimately, to the suicide attempt that left him paralyzed and further traumatized.

86.     As a result of Defendants' actions and omissions, Mr. Mayfield has experienced and will continue to experience extreme pain and suffering and loss of enjoyment of life.  As a further result of Defendants' conduct, Mr. Mayfield has and will continue to incur millions of dollars in expenses for lost wages, medical care, and assistance with daily living.

87.     Mr. Mayfield's injuries and the constant care he now requires have been devastating for his parents and required them to put their lives aside and spend basically all of their time, energy and limited financial resources caring for him. As a result of Defendants' actions and inactions, Mr. Mayfield's parents have also experienced and will continue to experience pain, suffering, and financial hardship.

/ / /

/ / /

**EXHUASTION OF PRE-LAWSUIT PROCEDURES**

**FOR STATE LAW CLAIMS**

88.    Plaintiff filed timely governmental tort claims with Defendant County of Sacramento regarding the November 22, 2012 assault on May 22, 2013 and regarding the July 17, 2013 suicide attempt on January 16, 2014. By correspondence dated May 29, 2013 and February 5, 2014, respectively, the County of Sacramento rejected these governmental tort claims.

**CAUSES OF ACTION**

**First Cause of Action**

**Excessive Force in Violation of the Fourth Amendment of United States Constitution (42 U.S.C. §1983)**

**(The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg, against Defendants Orozco, Jones, Does 1-5, and County of Sacramento)**

89.    Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

90.    The acts of Defendants relating to the November 2012 incident deprived Mr. Mayfield of his rights under the Fourth Amendment of the United States Constitution by utilizing excessive force upon him.

91.    The force used by Defendant Orozco against Mr. Mayfield was unjustified and excessive.

92.    All of the acts of Defendants and the persons involved were done under color and pretense of the statutes, ordinances, regulations, customs, official policies, official procedures, and usages of the County of Sacramento.

93.    Various deputies, directly or indirectly, participated in the affirmative acts of others, with the result that Mr. Mayfield was injured.

94.    On information and belief, Plaintiffs allege that the County of Sacramento has an inadequate policy of supervising sheriff's deputies and has not adequately trained its deputies so as to prevent the use of unlawful force such as

1  that described above.

2      95.   As a direct and proximate result of Defendants' actions, Mr. Mayfield

3  suffered humiliation, embarrassment, discomfort, mental anguish, fear, anxiety, loss

4  of reputation, emotional distress, and loss of his liberty and freedom.

5      96.   Defendants' actions were malicious, oppressive and/or in reckless

6  disregard of the Mr. Mayfield's rights, thereby justifying an award of exemplary or

7  punitive damages to punish the wrongful conduct alleged herein and to deter such

8  conduct in the future.

9                  **Second Cause of Action**

10  **Unreasonable Search and Seizure in Violation of the Fourth Amendment of**

11  **United States Constitution (42 U.S.C. §1983)**

12  **(The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg,**

13  **against Defendants Orozco, Jones, Does 1-5, and County of Sacramento)**

14      97.   Plaintiffs incorporate all of the above previous paragraphs as if fully

15  set forth herein.

16      98.   The acts of Defendants relating to the November 2012 incident

17  deprived Mr. Mayfield of his rights under the Fourth Amendment of the United

18  States Constitution by effectuating an unreasonable search and/or seizure of him.

19      99.   Defendant Orozco's actions against Mr. Mayfield were unreasonable,

20  and effectuated a search and/or seizure of Mr. Mayfield's person in violation of the

21  Fourth Amendment.

22      100.   All of the acts of Defendants and the persons involved were done

23  under color and pretense of the statutes, ordinances, regulations, customs, official

24  policies, official procedures, and usages of the County of Sacramento.

25      101.   Various deputies, directly or indirectly, participated in the affirmative

26  acts of others, with the result that Mr. Mayfield was injured.

27      102.   On information and belief, Plaintiffs allege that the County of

28  Sacramento has an inadequate policy of supervising sheriff's deputies and has not

FOURTH AMENDED COMPLAINT        -22-

1   adequately trained its deputies so as to prevent the use of unlawful force such as

2   that described above.

3        103.   As a direct and proximate result of Defendants' actions, Mr. Mayfield

4   suffered humiliation, embarrassment, discomfort, mental anguish, fear, anxiety, loss

5   of reputation, emotional distress, and loss of his liberty and freedom.

6        104.   Defendants' actions were malicious, oppressive and/or in reckless

7   disregard of Mr. Mayfield's rights, thereby justifying an award to his Estate of

8   exemplary or punitive damages to punish the wrongful conduct alleged herein and

9   to deter such conduct in the future.

10              **Third Cause of Action**

11   **Deliberate Indifference to Serious Medical and Mental Health Needs in**

12   **Violation of the Fourteenth Amendment of United States Constitution (42**

13                    **U.S.C. §1983)**

14   **(The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg,**

15   **against Defendants Jones, Lewis, Pattison, County of Sacramento, Sokolov,**

16                 **Hales, and Does 1-5)**

17        105.   Plaintiffs incorporate all of the above previous paragraphs as if fully

18   set forth herein.

19        106.   The County of Sacramento and the University of California at Davis'

20   policies, practices, and procedure deprived Mr. Mayfield of his rights under the

21   Fourteenth Amendment of the Constitution, including, without limitation, the right

22   to adequate medical and mental health care. This conduct represents a policy and/or

23   practice of deliberate indifference towards the needs of inmates.

24        107.   On numerous occasions prior to July 17, 2013, Defendants were

25   informed and knew that Mr. Mayfield routinely held suicidal ideations, was

26   routinely gravely disabled, and was routinely an immediate danger to himself.

27   However, Defendants failed to administer standard and necessary medical and

28   mental health treatment to Mr. Mayfield before, during, and after these episodes.

FOURTH AMENDED COMPLAINT          -23-

Defendants also failed to properly classify and house Mr. Mayfield based on his serious health needs.

108.   The policies, procedures, and protocols which Defendants had in place and which were administered by personnel at the Jail related to mental health treatment and suicide prevention were legally and medically insufficient to protect Mr. Mayfield from suicide and harm. For instance,

a.   After having specifically noted in the chart that Mr. Mayfield was considering killing himself by jumping head-first onto the floor, Defendants forced Mr. Mayfield to live in a room with a bunk bed and hard floors in which he suffered injury. Defendants should have taken steps to mitigate or eliminate these dangers. These and other physical characteristics of the room constituted unreasonably dangerous premises.

b.   Mr. Mayfield reported his suicidal ideations to Jail personnel on many occasions. However, Defendants' only response was to isolate Mr. Mayfield in restraints in a classroom or the psychiatric unit, without providing necessary clinical treatment, and then release him back to the general population without any additional treatment and little, if any, follow-up.

c.   Defendants failed to have proper protocols, policies, and procedures in place to minimize and mitigate Mr. Mayfield's ability to inflict self-harm.

d.   Defendants' procedures, practices, policies, and processes for assessing and treating inmates with serious mental illness, including Mr. Mayfield, focused on acute symptoms of a very limited number of inmates and did not adequately identify or treat inmates with serious mental health needs. Inmates with serious mental health conditions, such as Mr. Mayfield, were unable to obtain timely and appropriate

1    care, particularly if they were not showing acute symptoms.

2    e.    On information and belief, Defendants have a policy and practice of

3          providing mental health treatment—primarily consisting of isolation

4          and restraint—only to patients who would meet the requirements for

5          involuntary detention under California Welfare and Institutions code

6          section 5150. This does not meet the Constitutional standard for the

7          provision of minimally adequate mental health treatment in Jail.

8    f.    Following Mr. Mayfield's return to the Jail after treatment for

9          restoration of competency at Napa State Hospital, Defendants failed to

10          provide Mr. Mayfield with necessary mental health treatment, causing

11          him to once again decompensate to the point where he was gravely

12          disabled and posed serious risk of harm to himself.

13    g.    Defendants failed to appropriately assess Mr. Mayfield's suicidality,

14          risk of harm to himself, and mental illness, and, instead, chose to

15          ignore his symptoms and refuse to provide him treatment.

16    h.    Despite Defendants' knowledge that Mr. Mayfield needed care, Mr.

17          Mayfield routinely experienced significant delays in receiving even the

18          minimal health treatment provided by Defendants. These delays

19          caused him further harm.

20    i.    Despite Defendants' knowledge that Mr. Mayfield had been subjected

21          to physical abuse including sexual assault by other inmates,

22          Defendants failed to assess the effects of that abuse on Mr. Mayfield's

23          mental health and risk for self-harm.

24    109.   By policy and practice, Defendants fail to provide adequate mental

25    health treatment to inmates with mental illness such as Mr. Mayfield, including but

26    not limited to: failure to provide appropriate medication and ensure timely

27    distribution of medication; failure to appropriately supervise and evaluate the

28    administration of medication; failure to provide a sufficient number of trained

mental health professionals; failure to set up an appropriate, systematic program for screening and evaluating inmates to identify those in need of mental health care; failure to institute a treatment program that involves more than the segregation and close supervision of mentally ill inmates; failure to provide appropriate treatment including counseling and therapy, failure to identify and provide appropriate clinical treatment to inmates in acute psychiatric crisis; failure to appropriately screen for suicidality, implement adequate suicide precautions or establish a basic program to identify, treat and supervise inmates at risk for suicide; and failure to provide appropriate follow-up treatment to inmates released from suicide watch.

110.   Defendants employ inadequate policies, procedures, and practices for identifying inmates in need of medical and mental health treatment and providing appropriate medical and mental health treatment. Defendants also fail to appropriately train and supervise staff regarding the provision of treatment to inmates with medical and mental health issues, especially if the mental illness presents as not presently acute.

111.   Defendants have consistently failed to meet their constitutional obligation to provide adequate medical and mental health care to prisoners in their jails. The mental health care provided by Defendants to prisoners in their jails is woefully inadequate and falls far short of all of the minimum elements of a constitutional mental health care system. Defendants' failure to correct their policies, procedures, and practices, despite notice of significant and dangerous problems, evidences deliberate indifference in the provision of mental health treatment.

112.   Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to provide Mr. Mayfield with appropriate medical or psychiatric care and to identify suicide risk, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to identify suicide risk and provide treatment, constituted

1     deliberate indifference to Mr. Mayfield's serious medical needs, health and safety.

2          113.   All of the acts of the persons involved in Mr. Mayfield's care were

3     done under color and pretense of the statutes, ordinances, regulations, customs,

4     official policies, official procedures, and usages of the County of Sacramento.

5          114.   On information and belief, Mr. Mayfield alleges that the County of

6     Sacramento has allocated insufficient financial and material resources to the County

7     Sheriff to allow the County Sheriff to properly care for the mental health needs of

8     inmates while complying with other statutory mandates.  In addition, Defendants

9     Jones, Lewis and Pattison, who all have budgetary authority in the allocation and

10    spending of money given to the Sheriff for operation of the County Jail, have

11    allocated insufficient funding and material resources to mental health personnel for

12    the care and treatment of persons who have serious mental illness, especially if the

13    mental illness presents itself in a non-acute fashion.

14         115.   The net result of this policy of underfunding and insufficient training is

15    that inmates' mental health conditions worsen while under Defendants' care and, in

16    situations such as Mr. Mayfield's, inmates injure themselves.

17         116.   As a direct and proximate result of Defendants' actions, Mr. Mayfield

18    suffered bodily injury, emotional distress, loss of the enjoyment of life, and

19    numerous other forms of damage.

20         117.   Defendants' actions were malicious, oppressive and/or in reckless

21    disregard of Mr. Mayfield's rights, thereby justifying an award to his Estate of

22    exemplary or punitive damages to punish the wrongful conduct alleged herein and

23    to deter such conduct in the future.

24    / / /

25    / / /

26    / / /

27

28

_____
FOURTH AMENDED COMPLAINT              -27-

1

## Fourth Cause of Action

2

**Failure to Protect from Harm in violation of the Fourteenth Amendment to the**

3

**United States Constitution (42 U.S.C. §1983, 42 U.S.C. §15601, et al.)**

4

**(The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg,**

5

**against Defendants Jones, Lewis, Pattison, County of Sacramento, Sokolov,**

6

**Hales, and Does 1-5)**

7

118.   Plaintiffs incorporate all of the above previous paragraphs as if fully

8

set forth herein.

9

119.   Defendants could have taken action to prevent unnecessary harm to

10

Mr. Mayfield, but refused or failed to do so. As a result, Mr. Mayfield was severely

11

and permanently injured in July 2013.

12

120.   Defendants failed to have minimally necessary policies and procedures

13

concerning the adequate identification and housing of Mr. Mayfield, whom they

14

knew or should have known to be at risk of self-harm and vulnerable to harm from

15

other inmates.

16

121.   Defendants also failed to implement minimally sufficient policies and

17

procedures to protect Mr. Mayfield from harm. Defendants failed to appropriately

18

train and supervise staff regarding identification and handling of detainees at risk of

19

harm.

20

122.   Defendants failed to protect Mr. Mayfield from harm on numerous

21

occasions, including but not limited to Defendant Orozco's November 2012 assault,

22

the sexual assaults on Mr. Mayfield by other inmates and Mr. Mayfield's July 2013

23

suicide attempt and paralyzing injury. Defendants' acts and/or omissions as alleged

24

herein, including but not limited to their failure to take appropriate measures to

25

protect Mr. Mayfield from harm, along with the acts and/or omissions of the

26

Defendants in failing to train, supervise and/or promulgate appropriate policies and

27

procedures in order to protect Mr. Mayfield from harm, constituted deliberate

28

indifference to Mr. Mayfield's health and safety.

FOURTH AMENDED COMPLAINT          -28-

123.   As a direct and proximate result of Defendants' conduct, Mr. Mayfield experienced physical pain, severe emotional distress, and mental anguish during his incarceration. Mr. Mayfield continues to suffer physical pain, severe emotional distress, and mental anguish as a result of his life-altering injuries.

124.   Defendants' actions were malicious, oppressive and/or in reckless disregard of Mr. Mayfield's rights, thereby justifying an award to his Estate of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### Fifth Cause of Action

**Deprivation of Substantive Due Process Rights in Violation of First and Fourteenth Amendments of the United States Constitution – Loss of Familial Companionship (42 U.S.C. §1983)**

**(Plaintiffs James Allison Mayfield Jr. and Terri Mayfield against Defendants Jones, Lewis, Pattison, County of Sacramento, Sokolov, Hales, and Does 1-5)**

125.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

126.   The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to Mr. Mayfield's serious medical needs, health and safety, violating Mr. Mayfield's constitutional rights, and their failure to train, supervise, and/or take other appropriate measures to prevent the acts and/or omissions that caused Mr. Mayfield's serious injuries deprived Plaintiffs James Allison Mayfield, Jr. and Terri Mayfield of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

127.   As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein.

128.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiffs' rights, thereby justifying an award to Plaintiffs of

1  exemplary or punitive damages to punish the wrongful conduct alleged herein and

2  to deter such conduct in the future.

3  **Sixth Cause of Action**

4  **Discrimination on the Basis of Disability (Americans with Disabilities Act, 42**

5  **U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. §**

6  **794a)**

7  **(The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg,**

8  **against Defendants University of California Davis Health System and County**

9  **of Sacramento)**

10  129.   Plaintiffs incorporate all of the above previous paragraphs as if fully

11  set forth herein.

12  130.   At all relevant times, Mr. Mayfield suffered from a "disability" within

13  the meaning and scope of 42 U.S.C. §12102 as a result of his mental impairment.

14  Accordingly, Mr. Mayfield was a member of the class of persons protected by the

15  ADA and Section 504 of the Rehabilitation Act, which make it unlawful for a

16  public entity and entities receiving federal funds to discriminate against an

17  individual with a disability, or to deny the benefits of the services, programs, or

18  activities of a public entity or entity receiving federal funds to a person with a

19  disability.

20  131.   Defendants discriminated against Mr. Mayfield because of his

21  disabilities and denied him the benefits of public services, programs and activities

22  as a result of his disabilities by, among other things; failing to provide proper and

23  reasonable training to County correctional officers and Jail Psychiatric Program

24  staff regarding how to respond to persons in custody with physical and mental

25  impairments; failing to respond reasonably in dealing with a person with

26  psychiatric disabilities who experienced episodes of psychiatric distress; by

27  denying Mr. Mayfield access to the inpatient program at the Jail because of his

28  psychiatric disabilities; and by imposing punishments on Mr. Mayfield for actions

1  related to his psychiatric disabilities.

2      132.   The acts and omissions of Defendants violated the ADA and Section

3  504, which prohibit discrimination on the basis of physical and mental disability,

4  and protect persons such as Mr. Mayfield from the type of injuries and damages set

5  forth herein.

6      133.   Defendants University of California Davis Health System is not

7  entitled to immunity from suit under the Eleventh Amendment for this cause of

8  action.

9      134.   As a direct and legal result of Defendants' acts and omissions, Mr.

10  Mayfield's Estate suffered damages, including, without limitation, pain and

11  suffering; emotional distress; attorneys' fees; costs of suit; other pecuniary losses

12  not yet ascertained.

13  ### Seventh Cause of Action

14  ### Medical Malpractice (California State Law)

15  **(The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg,**

16  **against Defendants Sokolov, Hales, and Does 1-5)**

17      135.   Plaintiffs incorporate all of the above previous paragraphs as if fully

18  set forth herein.

19      136.   Defendants failed to comply with professional standards in the

20  treatment of Mr. Mayfield's serious mental illness by failing to appropriately assess

21  and evaluate his mental health and suicide risk, failing to take appropriate and

22  timely suicide prevention measures, prematurely removing Mr. Mayfield from

23  suicide watch and returning him to an unsafe cell, failing to provide appropriate

24  mental health treatment, and failing to prescribe or provide appropriate and

25  necessary psychiatric medications and ensure compliance with those medications.

26      137.   Defendants also failed to appropriately supervise, review, and ensure

27  the competence of medical staff's and custodial staff's provision of treatment to Mr.

28  Mayfield, and failed to enact appropriate standards and procedures that would have

1    prevented such harm to him.

2        138.   As a direct and proximate cause of this negligence and failure to meet

3    their professional standards of care, Mr. Mayfield's Estate suffered injuries and

4    damages as alleged herein.

5        139.   The negligent conduct of these Defendants was committed within the

6    course and scope of their employment.

7        140.   Defendants' actions were malicious, oppressive and/or in reckless

8    disregard of Mr. Mayfield's rights, thereby justifying an award to his Estate of

9    exemplary or punitive damages to punish the wrongful conduct alleged herein and

10   to deter such conduct in the future.

11                          **Eighth Cause of Action**

12       **Failure to Furnish/Summon Medical Care (California State Law)**

13   **(The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg,**

14      **against Defendants Jones, Lewis, Pattison, County of Sacramento, Sokolov,**

15                              **and Does 1-5)**

16       141.   Plaintiffs incorporate all of the above previous paragraphs as if fully

17   set forth herein.

18       142.   Defendants owed Mr. Mayfield a duty of care to provide him

19   immediate medical and mental health care.

20       143.   The conduct of Defendants alleged herein, including but not limited to

21   the facts that Defendants knew or had reason to know that Mr. Mayfield was in

22   need of immediate medical and mental health care and that Defendants failed to

23   take reasonable action to summon or provide that care, resulting in Mr. Mayfield's

24   permanent and severe injury as alleged herein, violated California state law,

25   including Cal. Govt. Code §§ 844.6 and 845.6.

26       144.   Defendants also failed to timely and appropriately respond to Mr.

27   Mayfield's repeated expressions of suicidal ideation.

28       145.   The alleged conduct of Defendants was committed within the course

_____
FOURTH AMENDED COMPLAINT        -32-

1    and scope of their employment.

2         146.   As a direct and proximate result of Defendants' breach, Mr.

3    Mayfield's Estate suffered injuries and damages causing great pain, as alleged

4    herein.

5         147.   Defendants' actions were malicious, oppressive and/or in reckless

6    disregard of Mr. Mayfield's rights, thereby justifying an award to his Estate of

7    exemplary or punitive damages to punish the wrongful conduct alleged herein and

8    to deter such conduct in the future.

9                        **Ninth Cause of Action**

10                       **Assault (California State Law)**

11   **(The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg,**

12        **against Defendants Orozco, the County of Sacramento, and Does 1-5)**

13        148.   Plaintiffs incorporate all of the above previous paragraphs as if fully

14   set forth herein.

15        149.   Defendant Orozco's above-described actions in November 2012

16   constituted intent to place Mr. Mayfield in immediate fear of an offensive contact

17   upon his person.  Defendant Orozco's conduct also constituted intent to cause a

18   harmful offensive contact upon Mr. Mayfield's person. Defendant Orozco did not

19   have consent, authority, or necessity to justify his conduct.

20        150.   Mr. Mayfield was placed in fear of an offensive contact upon his

21   person when Defendant Orozco offensively touched him in the manner described

22   above and also when he caused him his injuries in November 2012.

23        151.   Defendants' actions were malicious, oppressive and/or in reckless

24   disregard of Mr. Mayfield's rights, thereby justifying an award to his Estate of

25   exemplary or punitive damages to punish the wrongful conduct alleged herein and

26   to deter such conduct in the future.

27   / / /

28   / / /

FOURTH AMENDED COMPLAINT          -33-

1

### Tenth Cause of Action

2

### Battery (California State Law)

3

### (The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg,

4

### against Defendants Orozco, the County of Sacramento, and Does 1-5)

5

152.   Plaintiffs incorporate all of the above previous paragraphs as if fully

6

set forth herein.

7

153.   Defendant Orozco, without cause or justification, touched Mr.

8

Mayfield with the intent to harm or offend him in November 2012.

9

154.   Mr. Mayfield did not consent to the touching,

10

155.   Mr. Mayfield was harmed by the touching.

11

156.   Defendants' actions were malicious, oppressive and/or in reckless

12

disregard of Mr. Mayfield's rights, thereby justifying an award to his Estate of

13

exemplary or punitive damages to punish the wrongful conduct alleged herein and

14

to deter such conduct in the future.

15

### Eleventh Cause of Action

16

### Violation of the Bane Act, Civil Code §52.1 (California State Law)

17

### (The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg,

18

### against Defendants Orozco, the County of Sacramento, and Does 1-5)

19

157.   Plaintiffs incorporate all of the above previous paragraphs as if fully

20

set forth herein.

21

158.   Defendants, without cause or justification, acted intimidatingly,

22

coercively, and violently against Mr. Mayfield and interfered with his civil rights in

23

November 2012.

24

159.   Mr. Mayfield was harmed by these acts.

25

160.   Defendants' actions were malicious, oppressive and/or in reckless

26

disregard of Mr. Mayfield's rights, thereby justifying an award to his Estate of

27

exemplary or punitive damages to punish the wrongful conduct alleged herein and

28

to deter such conduct in the future.

1

2

3

4

**Twelfth Cause of Action**

**Negligence (California State Law)**

**(All Plaintiffs against Defendants Orozco, Jones, Lewis, Pattison, County of Sacramento, Sokolov, Hales, and Does 1-5)**

5

6

161.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

7

8

9

10

162.   With respect to the November 2012 incident, Defendants County of Sacramento and Orozco owed a duty to Mr. Mayfield to treat him reasonably, humanely, and carefully while he was in their care. Defendants breached that duty, and Mr. Mayfield suffered injuries as a result.

11

12

13

14

15

16

17

18

163.   With respect July 2013 incident, Defendants Jones, Lewis, Pattison, County of Sacramento, and Sokolov owed a duty to Mr. Mayfield and to all inmates to ensure that sufficient funds were allocated in order to institute appropriate programs designed to care for the mental health needs of inmates and that appropriate programs were instituted.  In addition, Defendants had a duty to care for Mr. Mayfield's mental health needs utilizing the equipment, personnel, and facilities over which they had control. Defendants breached that duty, and Mr. Mayfield suffered injuries as a result.

19

20

21

22

23

24

25

164.   These same Defendants failed to comply with professional standards in the treatment of Mr. Mayfield's serious mental illness by failing to appropriately assess and evaluate his mental health and suicide risk, failing to take appropriate and timely suicide prevention measures, failing to place Mr. Mayfield in suicide watch, placing Mr. Mayfield in an unsafe cell, failing to provide appropriate mental health treatment, and failing to prescribe or provide appropriate and necessary psychiatric medications and ensure compliance with those medications.

26

27

28

165.   These Defendants also failed to appropriately supervise, review, and ensure the competence of medical staff's and custodial staff's provision of treatment to Mr. Mayfield, and failed to enact appropriate standards and procedures

1  that would have prevented such harm to him.

2      166.   Together, these Defendants acted negligently and improperly,

3  breached their respective duties, and as a direct and proximate result, Plaintiffs

4  suffered injuries and damages as alleged herein.

5      167.   The negligent conduct of Defendants was committed within the course

6  and scope of their employment.

7      168.   Defendants' actions were malicious, oppressive and/or in reckless

8  disregard of the Plaintiffs' rights, thereby justifying an award to Plaintiffs of

9  exemplary or punitive damages to punish the wrongful conduct alleged herein and

10 to deter such conduct in the future.

**Thirteenth Cause of Action**

**Negligent Supervision, Training, Hiring, and Retention (California State Law)**

**(All Plaintiffs against Defendants Orozco, Jones, Lewis, Pattison, County of**

**Sacramento, Sokolov, Hales, and Does 1-5)**

15     169.   Plaintiffs incorporate all of the above previous paragraphs as if fully

16 set forth herein.

17     170.   Defendants had a duty to hire, supervise, train, and retain employees

18 and/or agents so that employees and/or agents refrain from the conduct and/or

19 omissions alleged herein.

20     171.   Defendants breached this duty, causing the conduct alleged herein.

21     172.   Such breach constituted negligent hiring, supervision, training, and

22 retention under the laws of the State of California.

23     173.   As a direct and proximate result of Defendants' failure, Plaintiffs

24 suffered injuries and damages as alleged herein.

25     174.   Defendants' actions were malicious, oppressive and/or in reckless

26 disregard of the Plaintiffs' rights, thereby justifying an award to Plaintiffs of

27 exemplary or punitive damages to punish the wrongful conduct alleged herein and

28 to deter such conduct in the future.

FOURTH AMENDED COMPLAINT        -36-

1

**Fourteenth Cause of Action**

2

**Dangerous Condition of Public Property**

3

**(The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg,**

4

**against Defendants Jones, Lewis, Pattison, County of Sacramento, Sokolov,**

5

**Hales, and Does 1-5)**

6

175.   Plaintiffs incorporate all of the above previous paragraphs as if fully

7

set forth herein.

8

176.   Defendants failed to ensure that Mr. Mayfield's inmate housing was

9

safe and not dangerous. In spite of having full knowledge of Mr. Mayfield's

10

suicidal ideation and his threat to jump off his bunk and injure himself, and full

11

control over the placement and housing of Mr. Mayfield, Defendants took no steps

12

to assign or devise alternate sleeping arrangements so as to minimize, let alone

13

eliminate, the danger to Mr. Mayfield of his having a bunk bed in his cell.

14

177.   This dangerous condition was created and controlled by said

15

Defendants and was a substantial factor in Mr. Mayfield injuring himself.

16

178.   Defendants' actions were malicious, oppressive and/or in reckless

17

disregard of Mr. Mayfield's rights, thereby justifying an award to his Estate of

18

exemplary or punitive damages to punish the wrongful conduct alleged herein and

19

to deter such conduct in the future.

20

**Fifteenth Cause of Action**

21

**Intentional Infliction of Emotional Distress (California State Law)**

22

**(All Plaintiffs against Defendants Orozco, Jones, Lewis, Pattison, County of**

23

**Sacramento, Sokolov, Hales, and Does 1-5)**

24

179.   Plaintiffs incorporate all of the above previous paragraphs as if fully

25

set forth herein.

26

180.   Defendants intentionally inflicted emotional distress on Plaintiffs by

27

engaging in extreme and reckless behavior that intended to cause them emotional

28

distress and/or acting with reckless disregard of the possibility that Plaintiffs would

suffer emotional distress. Plaintiffs did in fact suffer emotional distress, and continue to suffer emotional distress, as a result of Defendants' conduct.

181.   As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiffs were injured as set forth above.

182.   Defendants' actions were malicious, oppressive and/or in reckless disregard of the Plaintiffs' rights, thereby justifying an award to Plaintiffs of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Sixteenth Cause of Action

### Negligent Infliction of Emotional Distress (California State Law)

### (The Estate of James Joshua Mayfield, by and through Plaintiff Lisa Berg, against Defendants Orozco, Jones, Lewis, Pattison, County of Sacramento, Sokolov, Hales, and Does 1-5)

183.   Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

184.   Defendants' conduct at issue herein was negligent. Mr. Mayfield suffered significant emotional distress, and continues to suffer significant emotional distress. Defendants' negligence was a substantial factor in causing Mr. Mayfield's serious emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.   For compensatory, general and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.   For damages related to the impact of Defendants' conduct on the parent-child relationship between Plaintiffs James Allison Mayfield, Jr., and Terri Mayfield, and Mr. Mayfield;

3.   General damages, including damages for physical and emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness

and trauma and suffering, the loss of the services, society, care and protection of the decedent, as well as the loss of financial support and contributions, loss of the present value of future services and contributions, and loss of economic security;

4.      Prejudgment interest;

5.      For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

6.      For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

7.      For restitution as the court deems just and proper;

8.      For such other relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs hereby request a jury trial in this matter.


Dated:  June 17, 2016                    Respectfully Submitted,

                                         RIFKIN LAW OFFICE

                                         HADSELL STORMER & RENICK LLP


                                         By:    /s/ - Caitlan McLoon
                                                Barbara Enloe Hadsell
                                                Dan Stormer
                                                Joshua Piovia-Scott
                                                Lori Rifkin
                                                Acrivi Coromelas
                                                Caitlan McLoon
                                         Attorneys for Plaintiffs

# EXHIBIT 1

GC-350

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(name, address, and State Bar number):* | FOR RECORDER'S USE ONLY |
|---|---|
| After recording return to:<br>Penelope R. Brown 217861/Stacey K. Brennan 242765<br>BOUTIN JONES INC.<br>555 Capitol Mall, Suite 1500<br>Sacramento, CA  95814<br><br>TEL NO.: (916) 321-4444    FAX NO. *(optional):* (916) 441-7597<br>E-MAIL ADDRESS *(optional):*<br>ATTORNEY FOR *(name):* Lisa J. Berg | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN
STREET ADDRESS: 222 E. Weber Avenue
MAILING ADDRESS: P.O. Box 201022
CITY AND ZIP CODE: Stockton, CA  95202-2709
BRANCH NAME:    Probate

| CONSERVATORSHIP OF *(name):*<br>JAMES JOSHUA MAYFIELD, also known as JOSHUA MAYFIELD<br>CONSERVATEE | CASE NUMBER:<br>STK-PR-CE-2016-0000057 |
|---|---|

| LETTERS OF CONSERVATORSHIP | FOR COURT USE ONLY |
|---|---|
| ☐ **Person**    ☒ **Estate**    ☐ **Limited Conservatorship** | |

1. ☒ *(Name):* Lisa J. Berg                                    is the appointed
   ☒ conservator   ☐ limited conservator   of the   ☐ person   ☒ estate
   of *(name):* James Joshua Mayfield, also known as Joshua Mayfield

2. ☐ *(For conservatorship that was on December 31, 1980, a guardianship of an adult or of the person of a married minor) (Name):*
   was appointed the guardian of the   ☐ person   ☐ estate   by order dated
   *(specify):*                          and is now the conservator of the   ☐ person
   ☐ estate   of *(name):*

3. ☐ Other powers have been granted or conditions imposed as follows:
   a. ☐ Exclusive authority to give consent for and to require the conservatee to receive medical treatment that the conservator in good faith based on medical advice determines to be necessary even if the conservatee objects, subject to the limitations stated in Probate Code section 2356.
      (1) ☐ This treatment shall be performed by an accredited practitioner of the religion whose tenets and practices call for reliance on prayer alone for healing of which the conservatee was an adherent prior to the establishment of the conservatorship.
      (2) ☐ *(If court order limits duration)* This medical authority terminates on *(date):*
   b. ☐ Authority to place the conservatee in a care or nursing facility described in Probate Code section 2356.5(b).
   c. ☐ Authority to authorize the administration of medications appropriate for the care and treatment of dementia described in Probate Code section 2356.5(c).
   d. ☐ Powers to be exercised independently under Probate Code section 2590 are specified in Attachment 3d *(specify powers, restrictions, conditions, and limitations).*
   e. ☐ Conditions relating to the care and custody of property under Probate Code section 2402 are specified in Attachment 3e.
   f. ☐ Conditions relating to the care, treatment, education, and welfare of the conservatee under Probate Code section 2358 are specified in Attachment 3f.
   g. ☐ *(For limited conservatorship only)* Powers of the limited conservator of the person under Probate Code section 2351.5 are specified in Attachment 3g.
   h. ☐ *(For limited conservatorship only)* Powers of the limited conservator of the estate under Probate Code section 1830(b) are specified in Attachment 3h.
   i. ☐ Other powers granted or conditions imposed are specified in Attachment 3i.

(SEAL)

4. ☐ The conservator is not authorized to take possession of money or any other property without a specific court order.

5. Number of pages attached: 0

WITNESS, clerk of the court, with seal of the court affixed.
Date:  MAY 0 9 2016

Sara Lin

Clerk, by _____, Deputy          Page 1 of 2

This form may be recorded as notice of the establishment of a conservatorship of the estate as provided in Probate Code § 1875.

GC-350

| CONSERVATORSHIP OF *(name)*: JAMES JOSHUA MAYFIELD, also known as JOSHUA MAYFIELD  CONSERVATEE | CASE NUMBER: STK-PR-CE-2016-0000057 |
|---|---|

## NOTICE TO INSTITUTIONS AND FINANCIAL INSTITUTIONS
### (Probate Code sections 2890–2893)

When these *Letters of Conservatorship* (Letters) are delivered to you as an employee or other representative of an *institution* or *financial institution* (described below) in order for the conservator of the estate (1) to take possession or control of an asset of the conservatee named above held by your institution (including changing title, withdrawing all or any portion of the asset, or transferring all or any portion of the asset) or (2) to open or change the name of an account or a safe-deposit box in your financial institution to reflect the conservatorship, you must fill out Judicial Council form GC-050 (for an institution) or form GC-051 (for a financial institution). An officer authorized by your institution or financial institution must date and sign the form, and you must file the completed form with the court.

There is no filing fee for filing the form. You may either arrange for personal delivery of the form or mail it to the court for filing at the address given for the court on page 1 of these Letters.

The conservator should deliver a blank copy of the appropriate form to you with these Letters, but it is your institution's or financial institution's responsibility to complete the correct form, have an authorized officer sign it, and file the completed form with the court. If the correct form is not delivered with these Letters or is unavailable for any other reason, blank copies of the forms may be obtained from the court. The forms may also be accessed from the judicial branch's public Web site free of charge. The Internet address (URL) is *www.courts.ca.gov/forms/.* Select the form group *Probate—Guardianships and Conservatorships* and scroll down to form GC-050 for an institution or form GC-051 for a financial institution. The forms may be printed out as blank forms and filled in by typewriter or may be filled out online and printed out ready for signature and filing.

An *institution* under California Probate Code section 2890(c) is an insurance company, agent, or broker; an investment company; an investment bank; a securities broker-dealer; an investment advisor; a financial planner; a financial advisor; or any other person who takes, holds, or controls an asset subject to a conservatorship or guardianship other than a financial institution. Institutions must file a *Notice of Taking Possession or Control of an Asset of Minor or Conservatee* (form GC-050) for an asset of the conservatee held by the institution. A single form may be filed for all affected assets held by the institution.

A *financial institution* under California Probate Code section 2892(b) is a bank, a trust, a savings and loan association, a savings bank, an industrial bank, or a credit union. Financial institutions must file a *Notice of Opening or Changing a Guardianship or Conservatorship Account or Safe-Deposit Box* (form GC-051) for an account or a safe-deposit box held by the financial institution. A single form may be filed for all affected accounts or safe-deposit boxes held by the financial institution.

## LETTERS OF CONSERVATORSHIP
### AFFIRMATION

I solemnly affirm that I will perform according to law the duties of  ☒ conservator  ☐ limited conservator.

Executed on *(date)*: April 15, 2016 at *(place)*: Sacramento, California

Lisa J. Berg

(TYPE OR PRINT NAME)



(SIGNATURE OF APPOINTEE)

## CERTIFICATION

I certify that this document, including any attachments, is a correct copy of the original on file in my office, and that the Letters issued to the person appointed above have not been revoked, annulled, or set aside, and are still in full force and effect.

Date: **MAY 09 2016**

Clerk, by ___Sara Lin___, Deputy

Sara Lin

GC-350 [Rev. July 1, 2015]

### LETTERS OF CONSERVATORSHIP
### (Probate—Guardianships and Conservatorships)

Page 2 of 2

 American LegalNet, Inc.  www.FormsWorkFlow.com

**EXHIBIT 2**

GC-350

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(name, address, and State Bar number):*<br>After recording return to:<br>CARLENA L. TAPELLA, SB# 160263<br>WEBB & TAPELLA LAW CORPORATION<br>7311 Greenhaven Drive, Suite 273<br>Sacramento, CA 95831-3593<br>TEL NO.: (916) 447-1675 FAX NO. *(optional):* (916) 447-8009<br>E-MAIL ADDRESS *(optional):* ctapella@probateattorneys.com<br>ATTORNEY FOR *(name):* JAMES A. MAYFIELD | |

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SAN JOAQUIN<br>STREET ADDRESS: 222 E. Weber Avenue<br>MAILING ADDRESS: Post Office Box 201022<br>CITY AND ZIP CODE: Stockton, CA 95202-2709<br>BRANCH NAME: Probate | *FOR RECORDER'S USE ONLY* |

| | |
|---|---|
| **CONSERVATORSHIP OF** *(name):*<br>JAMES JOSHUA MAYFIELD, also known as<br>JOSHUA MAYFIELD                    **CONSERVATEE** | CASE NUMBER:<br>STK-PR-CE-2016-0000057 |

| | |
|---|---|
| **LETTERS OF CONSERVATORSHIP**<br>[X] **Person**    [ ] **Estate**    [ ] **Limited Conservatorship** | *FOR COURT USE ONLY*<br><br>FILED 2016 MAY 23 AM 8:51<br>Sara Lin<br>DEPUTY |

1. [X] *(Name):* JAMES A. MAYFIELD                    is the appointed
   [X] conservator    [ ] limited conservator    of the    [X] person    [ ] estate
   of *(name):* JAMES JOSHUA MAYFIELD, also known as JOSHUA MAYFIELD

2. [ ] *(For conservatorship that was on December 31, 1980, a guardianship of an adult or of the person of a married minor) (Name):*
   was appointed the guardian of the    [ ] person    [ ] estate    by order dated
   *(specify):*                         and is now the conservator of the    [ ] person
   [ ] estate    of *(name):*

3. [X] Other powers have been granted or conditions imposed as follows:
   a. [X] Exclusive authority to give consent for and to require the conservatee to receive medical treatment that the conservator in good faith based on medical advice determines to be necessary even if the conservatee objects, subject to the limitations stated in Probate Code section 2356.
      (1) [ ] This treatment shall be performed by an accredited practitioner of the religion whose tenets and practices call for reliance on prayer alone for healing of which the conservatee was an adherent prior to the establishment of the conservatorship.
      (2) [ ] *(If court order limits duration)* This medical authority terminates on *(date):*
   b. [ ] Authority to place the conservatee in a care or nursing facility described in Probate Code section 2356.5(b).
   c. [ ] Authority to authorize the administration of medications appropriate for the care and treatment of dementia described in Probate Code section 2356.5(c).
   d. [ ] Powers to be exercised independently under Probate Code section 2590 are specified in Attachment 3d *(specify powers, restrictions, conditions, and limitations).*
   e. [ ] Conditions relating to the care and custody of property under Probate Code section 2402 are specified in Attachment 3e.
   f. [ ] Conditions relating to the care, treatment, education, and welfare of the conservatee under Probate Code section 2358 are specified in Attachment 3f.
   g. [ ] *(For limited conservatorship only)* Powers of the limited conservator of the person under Probate Code section 2351.5 are specified in Attachment 3g.
   h. [ ] *(For limited conservatorship only)* Powers of the limited conservator of the estate under Probate Code section 1830(b) are specified in Attachment 3h.
   i. [ ] Other powers granted or conditions imposed are specified in Attachment 3i.

   (SEAL)

4. [ ] The conservator is **not** authorized to take possession of money or any other property without a specific court order.
5. Number of pages attached: 0
   WITNESS, clerk of the court, with seal of the court affixed.
   Date: MAY 23 2016       Sara Lin
   Clerk, by _____, Deputy

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
GC-350 [Rev. July 1, 2015]
*Martin Dean's*
**ESSENTIAL FORMS™**

**LETTERS OF CONSERVATORSHIP**
(Probate-Guardianships and Conservatorships)

Probate Code, §§ 1834,
2890-2893;
Code of Civil Procedure, § 2015.6
www.courts.ca.gov

GC-350

| CONSERVATORSHIP OF *(name):*<br>JAMES JOSHUA MAYFIELD, also known as<br>JOSHUA MAYFIELD<br><br>CONSERVATEE | CASE NUMBER:<br>STK-PR-CE-2016-0000057 |

## NOTICE TO INSTITUTIONS AND FINANCIAL INSTITUTIONS
### (Probate Code sections 2890-2893)

When these *Letters of Conservatorship* (Letters) are delivered to you as an employee or other representative of an *institution* or *financial institution* (described below) in order for the conservator of the estate (1) to take possession or control of an asset of the conservatee named above held by your institution (including changing title, withdrawing all or any portion of the asset, or transferring all or any portion of the asset) or (2) to open or change the name of an account or a safe-deposit box in your financial institution to reflect the conservatorship, you must fill out Judicial Council form GC-050 (for an institution) or form GC-051 (for a financial institution). An officer authorized by your institution or financial institution must date and sign the form, and you must file the completed form with the court.

There is no filing fee for filing the form. You may either arrange for personal delivery of the form or mail it to the court for filing at the address given for the court on page 1 of these Letters.

The conservator should deliver a blank copy of the appropriate form to you with these Letters, but it is your institution's or financial institution's responsibility to complete the correct form, have an authorized officer sign it, and file the completed form with the court. If the correct form is not delivered with these Letters or is unavailable for any other reason, blank copies of the forms may be obtained from the court. The forms may also be accessed from the judicial branch's public Web site free of charge. The Internet address (URL) is *www.courts.ca.gov/forms/*. Select the form group *Probate—Guardianships and Conservatorships* and scroll down to form GC-050 for an institution or form GC-051 for a financial institution. The forms may be printed out as blank forms and filled in by typewriter or may be filled out online and printed out ready for signature and filing.

An *institution* under California Probate Code section 2890(c) is an insurance company, agent, or broker; an investment company; an investment bank; a securities broker-dealer; an investment advisor; a financial planner; a financial advisor; or any other person who takes, holds, or controls an asset subject to a conservatorship or guardianship other than a financial institution. Institutions must file a *Notice of Taking Possession or Control of an Asset of Minor or Conservatee* (form GC-050) for an asset of the conservatee held by the institution. A single form may be filed for all affected assets held by the institution.

A *financial institution* under California Probate Code section 2892(b) is a bank, a trust, a savings and loan association, a savings bank, an industrial bank, or a credit union. Financial institutions must file a *Notice of Opening or Changing a Guardianship or Conservatorship Account or Safe-Deposit Box* (form GC-051) for an account or a safe-deposit box held by the financial institution. A single form may be filed for all affected accounts or safe-deposit boxes held by the financial institution.

## LETTERS OF CONSERVATORSHIP
### AFFIRMATION

I solemnly affirm that I will perform according to law the duties of   [X] conservator.   [ ] limited conservator.

Executed on *(date):* January **22**, 2016   , at *(place):* Tracy, California.

JAMES A. MAYFIELD   ▶   *(signature)*

(TYPE OR PRINT NAME)   (SIGNATURE OF APPOINTEE)

### CERTIFICATION

I certify that this document, including any attachments, is a correct copy of the original on file in my office, and that the Letters issued to the person appointed above have not been revoked, annulled, or set aside, and are still in full force and effect.

| (SEAL) | Date: |
| | Clerk, by _____, Deputy |

GC-350 [Rev. July 1, 2015]

Martin Dean's
ESSENTIAL FORMS™

**LETTERS OF CONSERVATORSHIP**
(Probate-Guardianships and Conservatorships)

Page 2 of 2